867 A.2d 276

**Arthur J. HOFFMAN, et al.**

v.

**Toyome STAMPER, et al.**

**No. 33, Sept Term, 2004.**

Court of Appeals of Maryland.

Feb. 4, 2005.

2

4

James E. Carbine (James E. Carbine, Baltimore), Robert L. Byer, Pittsburgh, PA (Daniel J. Tobin, Kirkpatrick & Lockhart LLP, Washington, DC, David R. Fine, Kirkpatrick & Lockhart LLP, Harrisburg, PA, on brief), for petitioners.

Melvin J. Sykes (Andre R. Weitzman, Cheryl L. Hystad, Baltimore, on brief), for respondents.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, GREENE, JJ.

WILNER, J.

In an amended complaint filed in the Circuit Court for Baltimore City, nine plaintiffs claimed that, through an elaborate "flipping" scheme, the defendants had conspired to defraud them, and did defraud them, into purchasing dilapidated residential properties in Baltimore City at inflated prices.[1] The participants in this alleged conspiratorial scheme were (1) the "flippers," Robert Beeman, Suzanne Beeman, and a corporation controlled by the Beemans, A Home of Your Own, Inc.

---

1. The word "flipping" was not used at trial, but it has been used as a descriptive term by the parties on appeal.

(AHOYO), (2) the lenders, Irwin Mortgage Corporation (then known as Inland Mortgage Corporation) and one of Irwin's loan officers, Joyce Wood, and (3) the appraiser, Arthur Hoffman.[2] Each of the nine plaintiffs charged all of the defendants with conspiracy to defraud, fraud, violations of the State Consumer Protection Act (CPA), and negligent misrepresentation, and Irwin and Wood were charged as well with general negligence. Compensatory and punitive damages were sought by each plaintiff against each defendant.

After disposition by the court of various motions, a jury found each of the defendants liable to each of the plaintiffs for fraud, conspiracy to defraud, and violations of the CPA. The jury awarded each plaintiff, as against all of the defendants, differing amounts of economic damages and $145,000 for non-economic (emotional) damages, for an aggregate total of $1,434,020.[3] In addition, it awarded each plaintiff $200,000 in punitive damages against the Beemans and AHOYO. Through a partial judgment in their favor, the court had previously withdrawn from the jury the punitive damage claims against Irwin, Wood, and Hoffman. Their liability, joint and several, was only for the compensatory damages. In post-trial proceedings, the court awarded attorneys' fees and expenses under the CPA against all defendants in the aggregate amount of $195,591, subject to a dollar-for-dollar credit for attorneys' fees and expenses received by plaintiffs' counsel under their contingent fee agreement.

Everyone except Robert Beeman and AHOYO appealed, although Suzanne Beeman later withdrew her appeal. The Court of Special Appeals affirmed the judgments for compensatory damages, but, after concluding that there was sufficient evidence to show that Irwin, Wood, and Hoffman participated in the fraudulent scheme and made misrepresentations of

---

2. An additional "lender" defendant, Homeside Lending, Inc., was let out on summary judgment.

3. The record shows two other amounts as the aggregate judgment, but the parties agree that the correct amount, based on the jury's verdicts, is $1,434,020.

their own with actual knowledge of the fraud and the falsity of those representations, it reversed the partial judgment in their favor with respect to punitive damages and remanded for further proceedings on those claims. *See Hoffman v. Stamper,* 155 Md.App. 247, 843 A.2d 153 (2004).

On the premise that an award of attorneys' fees under the CPA must take into account all of the circumstances, including the amount of recovery, and because, on remand, there was the prospect of a punitive damage award being entered against Irwin, Wood, and Hoffman, the intermediate appellate court also vacated the award of attorneys' fees and remanded that as well for reconsideration. As "guidance" for the trial court, the Court of Special Appeals observed that an award of attorneys' fees under the CPA would not duplicate fees paid by the plaintiffs under a contingent fee agreement but would simply reimburse them for all or part of those fees.

We granted petitions for *certiorari* filed by Irwin, Wood, and Hoffman to consider the following questions:

(1) Was there sufficient evidence of culpability on Hoffman's part to sustain the verdicts for conspiracy, fraud, and violation of the CPA;

(2) In affirming the judgment for compensatory damages, did the Court of Special Appeals err in holding that, in an action based on fraud, non-economic damages may be awarded in the absence of any physical injury;

(3) Did the trial court err in instructing the jury that damages in an action based on fraud need be proved only by a preponderance of the evidence and, if so, did the Court of Special Appeals err in holding that Irwin and Wood waived their objection to such an instruction;

(4) Did the Court of Special Appeals err in reversing the judgment for Irwin, Wood, and Hoffman as to punitive damages and, if not, did it err in remanding for only a partial new trial on punitive damages rather than an entire new trial on all issues; and

(5) Did the Court of Special Appeals err in vacating the award of attorneys' fees and remanding that issue for further reconsideration?

We shall answer some of these questions in the affirmative and some in the negative and shall therefore affirm in part and reverse in part the judgment of the Court of Special Appeals. For convenience, we shall refer to the Beemans and AHOYO collectively as "Beeman," unless the context requires otherwise. Robert Beeman was the principal culprit. Irwin's culpability is a vicarious one, resting on the conduct of its employee, Wood.

## BACKGROUND

The basis of the plaintiffs' case, in a nutshell, was that Beeman (1) bought dilapidated properties in Baltimore City at low prices, (2) then searched for unsophisticated, low-income buyers with poor credit histories, (3) promised them that he could sell them a renovated home for a down payment of only $500, (4) got those buyers to sign contracts of sale at significantly inflated prices upon a promise to make extensive repairs, many of which were never made, (5) arranged for the buyers to finance the purchases with 100% FHA loans obtained through Wood, and (6) obtained those loans for the buyers in part by conspiring with Wood to have Hoffman prepare erroneous appraisals showing the value of the homes to be at or above the grossly inflated contract price and in part by engaging in practices that clearly violated Department of Housing and Urban Development (HUD) regulations and requirements regarding the FHA program in order to consummate the transactions. All nine plaintiffs—two of whom (Brower and Spencer) purchased one house together—testified that, after taking possession, they experienced major problems with their homes, some of which were uninhabitable. Six of the nine eventually lost their homes to foreclosure.

The transactions at issue in this case were as follows: [4]

---

4. There are some discrepancies and uncertainties with respect to the dates of Beeman's purchases and sales. In the record is an exhibit

| Property | Buyer | Beeman Purchase Price | Sale Price to Buyer |
|---|---|---|---|
| 17 N. Kresson St. | Jerry McFadden | $14,500 (4/23/97) | $52,000 (5/9/97) |
| 612 E. 41 St. | Carl Haley | $20,000 (6/25/97) | $57,200 (5/28/97) |
| 610 N. Belnord Ave. | Gertrude Green | $12,500 (6/18/97) | $44,000 (7/30/97) |
| 5601 Force Rd. | Denise Brower & Forrest Spencer | $24,000 (8/7/97) | $65,900 (7/21/97) |
| 406 Oldham St. | Francine Henderson | $17,550 (3/27/97) | $58,000 (2/17/97) $65,000 (9/9/97) |
| 3132 Piedmont Ave. | Eva Elder | $29,551 (9/5/97) | $51,000 (8/12/97) |
| 6521 Lenhert St. | Toyome Stamper | $41,790 (9/5/97) | $87,250 (8/14/97) |
| 1127 Carroll St. | Inez Coward | $ 7,550 (9/29/97) | $58,000 (12/19/97) |

The trial lasted three weeks, during which a great deal of documentary and testimonial evidence, some of it conflicting, was presented. We must view that evidence in a light most favorable to the part(ies) who prevailed on the issues to which it relates and shall recite the facts accordingly.

Beeman began his business of buying distressed houses in Baltimore City at low prices and selling them to unsophisticated buyers at inflated prices in 1996. Initially, he arranged financing for the buyers through conventional mortgage loans, but those loans financed only 60% to 80% of the purchase price. At some point in 1997, he met Wood, who was a loan officer for Irwin and dealt in FHA insured loans. Wood received a commission on loans generated by her and looked upon Beeman (and others in his line of business) as customers

stipulated to by the parties that purports to show those dates, but the source of that data is not clear. It seems to indicate when Beeman and his buyers took title to the properties, but there is other evidence that puts some of the dates stated for Beeman's purchases in question. The appropriate dates, for our purposes, are the dates that Beeman took title and then entered into contracts to sell the properties. The dates noted above for the sales to the plaintiffs are the dates on the contracts of sale. Closing of those sales took place two months or so later. With one or two exceptions, the dates upon which Beeman actually took title to the properties are not in the record. We shall use the dates stated in the exhibit even though by doing so it would appear that Beeman sold the properties before he had title to them. The discrepancies are not important with respect to the issues before us.

and a source of commission income for her. She educated Beeman about the FHA program. Mortgage loans approved under that program are insured by HUD. If a loan goes into default, the lender, or current holder of the mortgage, forecloses, buys the property at the foreclosure sale for the balance due on the loan, transfers the property to HUD, and is reimbursed by HUD for 100% of the unpaid balance of the loan. Because of the greatly reduced risk of loss under that arrangement, lenders are willing to lend up to 100% of the appraised value of the property.

Most of Beeman's prospective buyers had both poor credit and insufficient funds to meet their share of the closing costs. At their initial meeting, Wood advised Beeman that, under the HUD program, a seller could not contribute more than six percent of the loan amount (which, with a 100% loan, was equivalent to the purchase price), and that if the seller contributed more, the purchase price would be reduced accordingly. Included in the six percent cap were a seller's contributions to the buyer's share of closing costs and payments made to clear up the buyer's credit problems.[5] To maximize his profit, of course, Beeman had an incentive not to have any reduction of the contract price. Wood explained that it was possible for closing costs to be donated by a friend or relative of the buyer but that any such gift must be verified by (1) a gift letter from the donor, and (2) evidence that the funds were drawn from the donor's bank account.

Wood offered a range of services to Beeman to permit him to pursue his business. First, presumably aware that Beeman's buyers would be unable, on their own, to pay their share of closing costs, she gave him a supply of blank gift letters. She also agreed to generate on Irwin's computer, for

---

5. This advice was apparently based on HUD Mortgagee Letter 87–35, issued October 22, 1987, amending Mortgagee Letter 86–15 (August 8, 1986) to provide that "seller buydowns in excess of six percent of the mortgage amount must be applied as a dollar-for-dollar reduction of the sales price in mortgage credit process. Seller buydowns are payments for discount points, any type of interest payments, or seller payment of closing costs normally (under local market practice) paid by the buyer."

each buyer referred by Beeman, a "good faith estimate." The "good faith estimate," according to Wood, was based on the contract price and the estimated share of closing costs to be paid by the buyer and determined how much cash the buyer would need to close. That would allow Beeman to determine how much of a "gift" would be required. In fact, that estimate had a greater significance. In most, if not all, of the transactions, the "good faith estimate" prepared by Wood became the purchase price for the house. The purchase price thus was. determined by the maximum loan amount, not the other way around. It was not negotiated between Beeman and the buyers but was inserted into the contract by Beeman after the "good faith estimate" was calculated by Wood.

Each of the nine plaintiffs called Beeman in response to one of his ads offering a "rehabbed" home for only $500 down or after learning of such an offer by word-of-mouth. Beeman met with the plaintiff, ascertained the area of the City where the plaintiff wanted to live, got some basic credit information regarding the plaintiff, and showed the plaintiff the houses that he had in that part of the City, without clearly disclosing that the properties were his. Most of the plaintiffs thought that Beeman was an agent of some kind or a lender and did not realize that he was the owner/seller. Each house was still in a dilapidated condition, but Beeman promised that the house would be fixed by his own contractor, that he would have it inspected, and that he would assist in obtaining FHA financing for the plaintiff. When the plaintiff indicated interest, Beeman, either that day or shortly thereafter, drove him/her to Irwin's office in Columbia, where they met with Wood and made application for an FHA loan.

. Some of the plaintiffs testified that they signed a contract of sale with Beeman prior to meeting with Wood based on a price quoted or estimated by Beeman, that the purchase price was nonetheless left blank in the contract, and that, when or after meeting with Wood, a price had been inserted in the contract that was higher than was first quoted. Wood confirmed that Beeman and the buyer would bring contracts of sale when they met with her, that the price was sometimes missing from

the contract, but that it was inserted before the end of the meeting. Plaintiff McFadden said that Beeman had estimated the price of the house on Kresson Street at $50,000, but that, at the meeting with Wood the price had been filled in at $52,000. Plaintiff Haley said that he thought the price of the house on 41st Street was between $35,000 and $40,000, but that, when presented with the contract at Wood's office, the price was $57,200. Plaintiff Green was told by Beeman that the price for the house on Belnord Avenue would be $38,000, but that the contract handed to her by Wood showed the price as $44,000. When Beeman took Plaintiff Henderson to see the house on Oldham Street, he told her the purchase price would be $58,000; at the meeting with Wood, the price was changed to $65,000. When he took Plaintiff Coward to see the house on Carroll Street, he told her that the price was $40,000; at the meeting with Wood, she was handed a document showing the price to be $58,000.

As none of the plaintiffs had sufficient funds to pay their share of the closing costs, Beeman paid those costs through a sham transaction. Beeman asked each of them to find a friend or relative with a bank account who would be willing to act as a "donor." Once that was done, Beeman filled out one of the gift letters given to him by Wood and had the buyer and the "donor" sign the letter. The letter was an attestation by the "donor" that he/she was making a gift of the amount specified to the buyer, to be applied to the purchase of the property described, and that no repayment was expected. Beeman then arranged to meet the "donor," sometimes with the buyer, at the "donor's" bank or credit union. Beeman arrived with cash in an amount equal to the "gift." He gave the cash to the "donor," who deposited it into his/her account. The "donor" then obtained a certified check for that amount payable to the buyer and gave the check to Beeman. That check was then used to pay the buyer's share of transactional costs. The "donor" made no contribution to the costs; they were contributed entirely by Beeman.[6] Wood was aware that

---

6. The amounts contributed by Beeman through these phony gift letter transactions were as follows: (1) for McFadden, $3,000; (2) for Haley,

a "gift" would be required in each of the eight cases now before us.

Although all of the plaintiffs knew that Beeman was providing the funds and that the gift letters were not accurate, Beeman explained, when asked, that the gift letter procedure was necessary to provide the closing costs and was a standard and legitimate procedure in buying a house. The plaintiffs testified that they did not know that the process used by Beeman was illegal and that, had they known it was illegal, they would not have participated in it.

The third piece of the scheme was the appraisal. Hoffman, a licensed appraiser, had once worked for HUD and was familiar with the regulations and requirements pertaining to FHA loans. He also had worked for Irwin as an in-house appraiser. After leaving that employment, he continued to do freelance appraisal work for Irwin and was paid $300 for each appraisal. Indeed, he said that, after leaving Irwin's employ, 99% of his income still came from work he did for Irwin. We shall recite more of the evidence against Hoffman shortly. It will suffice here to note that there was evidence showing that (1) Hoffman was aware of a HUD requirement that, if an appraisal showed the value of the property to be less than the contract price, the buyer had to be informed and that the buyer then had an absolute right to cancel the contract, in Hoffman's words "that would kill the deal", (2) most of the appraisals he did in these cases contained admitted errors of one kind or another, either with respect to the appraised property itself or regarding the properties he used as comparable sales, (3) in most cases, he used inappropriate sales as comparable—properties in different kinds of neighborhoods or that were distant from the subject property that sold for higher prices—and ignored closer and more similar properties that had sold for much less, (4) in each case, he appraised the dilapidated property at or above the contract price without

$6,000; (3) for Green, $2,600; (4) for Brower and Spencer, $2,850; (5) for Henderson, $3,100; (6) for Elder, $2,200; (7) for Stamper, $4,800; (8) for Coward, $3,000.

regard to the much lower price paid by Beeman just months before, (5) although he justified the difference between Beeman's purchase price and his much higher appraisals on the basis that substantial repairs would be made to the property, he did not make reasonable efforts to assure that those repairs had, in fact, been made and many of them were not, in fact, made, (6) he was aware of a HUD requirement that an appraiser keep the supporting data for appraisals made with respect to FHA loans for a period of five years, and (7) in knowing and deliberate violation of that requirement, he destroyed those records shortly after Beeman's activity became public and investigations into it commenced. Because in each case the appraisal showed the value as equal to or greater than the inflated contract price, the buyer lost the option to cancel the contract.

With this somewhat general background, we turn to the issues before us.

## DISCUSSION

### A. *Hoffman's Culpability*

Pursuant to Maryland Rule 2–519, Hoffman moved for judgment at the end of the case, and, when that motion was denied and the verdicts against him were rendered, he moved for judgment NOV pursuant to Rule 2–532. That motion, too, was denied. He makes two complaints about the denial of those motions: (1) the trial court and the Court of Special Appeals applied the wrong evidentiary standard in resolving the motions addressing the conspiracy and fraud claims; and (2) because, under the correct standard, the evidence was legally insufficient to establish conspiracy, fraud, or violations of the CPA on his part, those motions should have been granted.

### (1) *Standard of Proof*

Hoffman contends that findings of conspiracy and fraud require proof by clear and convincing evidence and that, when reviewing the denial of the motions for judgment, the Court of

Special Appeals looked only to see whether there was "any evidence ... however slight" to support the claims. *Hoffman, supra,* 155 Md.App. at 288, 843 A.2d at 178. That, he claims, is not the proper standard.

■ Hoffman is correct in stating that fraud must be proved by clear and convincing evidence. *VF Corp. v. Wrexham Aviation,* 350 Md. 693, 704, 715 A.2d 188, 193 (1998). It is not so clear whether that standard applies to the conspiracy count. In *Daugherty v. Kessler,* 264 Md. 281, 292, 286 A.2d 95, 101 (1972), we held that "[i]n a civil case not involving a criminal act, conspiracy may be shown by a preponderance of the evidence." *Compare,* however, *Rent–A–Car Co. v. Globe & Rutgers Fire Ins. Co.,* 161 Md. 249, 267–68, 156 A. 847, 855 (1931), which could be read either consistently or inconsistently with that holding. In this case, it matters not.

■ Hoffman's argument arises from the statement by the Court of Special Appeals that, in a civil jury case, "if there is any evidence adduced, however slight, from which reasonable jurors could find in favor of the plaintiff on the claims presented, the trial court should deny the defendant's motion for judgment at the close of the evidence and submit the claims to the jury for decision." *Hoffman, supra,* 155 Md.App. at 288, 843 A.2d at 178. That is a correct statement, which mirrors what this Court has said in many cases. It would, however, be more precise if it read, "from which reasonable jurors, *applying the appropriate standard of proof,* could find in favor of the plaintiff on the claims presented." In *Darcars v. Borzym,* 379 Md. 249, 270, 841 A.2d 828, 840 (2004), we essentially made that point—that, in deciding a motion for judgment, a court "must account for and consider the appropriate burden of persuasion in deciding whether to allow the jury to decide an issue." Even though the Court of Special Appeals failed to cite *Darcars* when discussing this point, there is no indication that the intermediate appellate court failed to apply the appropriate standard in its review.[7] It

---

7. The intermediate appellate court *did* cite *Darcars* in its discussion of punitive damages, so it certainly was aware of that case.

understood that fraud needed to be shown by clear and convincing evidence and, indeed, believed that conspiracy required that heightened standard of proof as well.

The important thing, in any event, is not how the Court of Special Appeals articulated the standard but whether the appropriate standard was applied by the trial court in deciding the motion, and we think that it was. The trial judge filed a memorandum explaining his reasons for denying the motions for judgment NOV filed by Hoffman, Wood, and Irwin. In that memorandum, he clearly recognized that, although civil conspiracy need be proved only by a preponderance of the evidence, fraud must be shown by clear and convincing evidence, and there is no indication that he ever lost sight of that standard in finding the evidence sufficient to warrant submission of the fraud count to the jury. Whether the trial court was correct in that conclusion and, indeed, in its further conclusion that the evidence sufficed to warrant submission of the conspiracy and CPA counts, is now before us, and we shall examine those conclusions in light of what we said in *Darcars*.

### (2) *Evidence of Culpability*

As noted, the basic charge against Hoffman was that, in furtherance of the conspiracy by Beeman and Wood, Hoffman knowingly prepared inflated appraisals that he knew were necessary in order for the transactions to take place. Evidence to that end was presented with respect to each of the appraisals he prepared.

### (a) *McFadden—Kresson Street*

Beeman purchased the property at 17 N. Kresson Street on April 23, 1997 for $14,500. Less than three weeks later, on or about May 9, 1997, he sold the property to McFadden for $52,000. When the property was sold to McFadden, it was in the same condition as when Beeman bought it. On June 5, Hoffman, knowing that Beeman had only recently bought the property for $14,500, appraised the property for $52,000.[8]

---

8. The appraisal report was prepared on June 9 based on an inspection on June 5, and it appraised the property as of June 5.

There were a number of deficiencies noted in that report. A glaring, though relatively minor, one was that Hoffman reported that the property was in a residential zone, when, in fact, it was in a manufacturing zone. The census track number was also incorrect. The more significant errors concerned the condition of the structure and the comparable sales that Hoffman used to establish his estimate of value.

Hoffman noted that the property was in "poor condition" when purchased by Beeman but was in "good" condition "now." That could not have been so, for, on an attached Valuation Condition sheet, he listed 14 repairs that still needed to be made, from replacing rotted wood on the porch floor and ceiling, to repairing chipped paint in various parts of the house, to installing a downspout and gutter, to patching, pointing, and painting parts of the house, to replacing windows. He apparently assumed that all of them would be made. On July 2, Hoffman certified that those repairs had been completed, but there was evidence that some of them had not been done. Apart from the listed items, Hoffman stated on his Valuation Condition sheet that there was no evidence of roof leakage or damage. McFadden, when first inspecting the property with Beeman, noted that repairs needed to be made to the roof. Although someone—Wood thought it was probably Beeman—prepared and submitted to Wood a document showing that extensive repairs had been made, including a "new 2–ply roofing system on entire roof of property," a month after moving into the house McFadden said that the roof was leaking and that, when it rained, water poured into his laundry room.

The plaintiffs' expert appraiser described the Kresson Street property as being part of a residential "pocket" surrounded by industrial use properties and fronting on a "heavy truck traffic" road. The three properties used by Hoffman as comparable sales—3500 Claremont Avenue, 3613 East Fayette Street, and 3811 Gough Street—were all in residential areas quite some distance away. Indeed, the distances were misleadingly stated in the appraisal. Hoffman reported the Claremont Avenue property as five blocks away when, in fact, it was

eleven blocks away; the East Fayette Street property was reported as being four blocks away when, in fact, it was ten blocks away; he declared the Gough Street property to be four blocks away when it was shown to be twelve blocks away.[9] Evidence was presented that there were eight more comparable recent sales of properties in the neighborhood overlooked or ignored by Hoffman, and that the predominant value in the area was between $35,000 and $45,000.

### (b) *Haley—612 East 41st Street*

Beeman purchased the 41st Street property for $20,000 and, on May 28, 1997, sold it to Haley for $57,200. It is not clear when Beeman bought the property; the exhibit noted shows a date of June 25, but that is subject to question, for it would indicate that Beeman sold the property before he owned it. Hoffman appraised the property on July 17, 1997 at $57,500, subject to a $90 ground rent.[10] He reported that the property had been purchased a month earlier for "$25,000±" claiming to be unaware that the price paid was only $20,000. He stated that the house had been "recently re-habbed" and characterized its condition as "good." When Haley took possession in August, he found that the sump pump was broken and the basement had flooded, the kitchen windows and the kitchen and bedroom ceilings leaked when it rained, the floorboards under the living room carpet were rotting, the walls behind the paneling were crumbling, and the front porch had exten-

---

9. Hoffman claimed that his method of measurement was authorized by a HUD handbook provision directing appraisers to "[e]nter proximity in straight line distance, like '3 houses or one tenth of a mile W subject.'" The problem is that he did not state the distance to the comparables in parts of a mile but in terms of blocks. Hoffman regarded twelve blocks as equaling a mile, so if a property was a half mile away by direct measurement "as the crow flies," he would regard it as six blocks away even though it might, in fact, be twenty blocks away. In calculating distances in that manner, he made it appear that the "comparable" properties were a lot closer than they actually were. These discrepancies appeared in most of Hoffman's appraisals.

10. Most ground rents in Baltimore City are capitalized at six percent. Thus, had the property not been subject to the $90 ground rent, it would be worth $1,500 more.

sive dry rot. Hoffman based the inflation in price on his having seen workmen, sheetrock, carpeting, paint, and windows in the house when he inspected it. He did not ask for documentation, with respect to this appraisal or any other, that the work had been done. Instead, he made a cursory walk-around, often of just the exterior of the house, prior to closing.

Hoffman identified the sales of three properties as comparable, two of which he emphasized because the properties were only two blocks away. One, the evidence showed, was larger than he reported—1, 830 sf. rather than 1,600 sf. It also had a fireplace and a modern kitchen, which the subject property did not have. Evidence showed that the second comparable was "in far superior condition than the subject property." Three other lower-price sales in the area were ignored.

### (c) *Green—610 North Belnord Avenue*

Beeman purchased the Belnord Avenue property on June 18, 1997 for $12,500 and sold it to Green for $44,000 on July 30, 1997. On August 13, 1997, Hoffman appraised the property for $44,000, subject to a $180 ground rent ($3,000). For purposes of selecting comparable sales, he defined the "neighborhood" as "East Baltimore" with "no precise boundaries." The first comparable sale he chose was of 3501 East Baltimore Street, which, using his "as the crow flies" approach, he claimed was seven blocks away when in fact, it was sixteen blocks away. Another comparable sale was of 3613 East Fayette Street, which Hoffman said was five blocks away when, in fact, it was seventeen blocks away. Evidence showed that Beeman was also the person who sold that property, a fact that should have been, but was not, disclosed on the appraisal report. Evidence also showed that there were seven closer sales, at much lower prices, that were ignored by Hoffman.

### (d) *Brower/Spencer—5601 Force Road*

Beeman sold the property at 5601 Force Road to Brower and Spencer on July 21, 1997, for $65,900. He purchased the

property for $24,000, but, as with some of the other properties, it is not clear when he actually bought it. The record shows that he purchased it on August 7, 1997, but that is questionable. On August 26, 1997, Hoffman appraised the property for $65,900 subject to a $96 ground rent ($1,600). Unlike some of his other appraisals, Hoffman did not note that the property had been recently purchased by Beeman, although he did state that it was "recently renovated."

Hoffman selected three comparable sales, stressing the second one, 5531 Force Road, because it was on the same street. That house had sold very recently—settlement was in August, 1997—for $75,000. In deposition testimony that he sought to disavow at trial, Hoffman conceded that, without that sale as a comparable, he could not have justified a $65,900 appraisal of the subject property. What he did not disclose, although he knew, was that the allegedly comparable property had been sold by Beeman. The plaintiffs' expert noted that Beeman had purchased that property in August, 1997 for $27,000. He opined that the 5531 Force Road sale was "out of line" and that Beeman's role as seller should have been noted. The expert also identified six comparable sales, all within three blocks of the subject property, ignored by Hoffman— houses that sold for $36,500, $50,000, $44,500, $55,000, $55,000, and $45,000.

#### (e) *Henderson—406 Oldham Street*

Beeman purchased 406 Oldham Street for $17,550. The record indicates that he purchased the property on March 27, 1997, but that is questionable, for, on February 17, 1997, he entered into a contract to sell it to Henderson for $58,000 and was given a $500 deposit at that time. Nothing more transpired for several months. Beeman was supposed to be making repairs. In August, 1997, Henderson took possession under a lease calling for $500/month rent. No application for financing was made until September 9, 1997, when Beeman and Henderson met with Wood. At that meeting, the price was increased to $65,000, and a new contract at that price was

signed. On September 26, 1997, Hoffman appraised the property for $65,500 subject to a $90 ground rent ($1,500).

Plaintiffs' expert stated that the three comparables used by Hoffman were, for a variety of reasons, inappropriate. The subject property was surrounded by industrial uses and was near heavy truck and rail traffic. The comparables were in residential areas and one was only half the age of the subject property. The expert noted a number of closer properties in the area that had sold for much lower prices.

### (f) *Elder—3132 Piedmont Avenue*

Beeman purchased 3132 Piedmont Avenue for $29,551 and, on August 12, 1997, sold it to Elder for $51,000. It is not clear when Beeman bought the property; the record indicates that he bought it on September 5, 1997. On October 7, 1997, aware that Beeman had purchased the property only a month earlier for about $29,000, Hoffman appraised the property for $53,000, subject to a $180 ground rent ($3,000). He noted that the property had a "modern kitchen," although an inspection by the plaintiffs' expert revealed that not to be the case.

One of the comparables used by Hoffman—3033 Mondawmin Avenue—he reported as a center row house when in fact it was an end of group, which made it more valuable. It also had a new kitchen, for which no adjustment was noted. A second comparable he reported as having only 1,200 sf. when, in fact, it had 1,584 sf.; Hoffman also erred in stating the ground rent on that property, thereby overvaluing it by $1,400. He miscalculated the square footage of the third comparable as well, showing it as 1,100 sf. when, in fact, it was 1,292 sf. As in the other cases, plaintiffs' expert identified other comparables that Hoffman ignored.

### (g) *Stamper—6521 Lenhert Street*

Beeman purchased 6521 Lenhert Street for $41,790 and, on August 14, 1997, sold it to Stamper for $86,250. It is not clear when Beeman purchased the property; in his appraisal, Hoffman notes that it was bought in September, 1997—before it was sold to Stamper. Wood's initial "good faith estimate"

showed Stamper's share of closing costs to be $4,149. At some point, Wood discovered that the taxes on the property were higher than she first thought, which would increase Stamper's monthly payment. She suggested to Beeman that, if she added an up-front fee of one point, she could reduce the interest rate enough to keep the monthly payment the same. Beeman agreed, so a new "good faith estimate" of $87,250 was prepared showing the closing costs to be $4,519. On November 14, 1997, Hoffman appraised the property for $87,500, subject to a $180 ground rent ($3,000).

Hoffman reported that the house sat on a slab and had no crawl space, which the evidence showed was not the case. The existence of a crawl space would have been apparent from just walking around the house. Hoffman said that he *did* walk around the house but that, because it was raining that day, he walked fast. Hoffman also incorrectly reported that the house had 1,804 sf., when, in fact, it had only 1,505 sf. Two experts regarded that discrepancy, of nearly 20%, as significant; one noted that an appraiser could be suspended by FHA for a discrepancy over 10%.

### (h) *Coward—1127 Carroll Street*

Beeman purchased 1127 Carroll Street for $7,550 in September, 1997, and, on December 19, 1997, sold it to Coward for $58,000. On January 26, 1998, Hoffman appraised the property for $58,000, subject to a $180 ground rent ($3,000). Hoffman knew that Beeman owned the property and that he was required to report whether it had sold within the past year. Although, had he consulted the land records, he would have learned that Beeman bought the property a few months earlier, he reported "last sale unknown." When Hoffman initially could not locate any sales that he regarded as comparable, he called Beeman, who supplied him with sales of his own properties, somewhat distant from the subject property. Hoffman used those high-price sales as comparables, without disclosing that Beeman was the seller or that he had purchased those properties a short time before at far lower prices. The plaintiffs' expert opined that, when relying on

three comparables all controlled by the same seller, that fact should be disclosed.

The first comparable used by Hoffman, 1207 West Cross Street, he reported sold in December, 1997, for $73,900. He did not report that Beeman had purchased the property in October, 1997, for $27,000 but instead reported that there was no other sale within the year. The second comparable, 1202 Carroll Street, he reported as sold in September, 1997, for $54,900 without disclosing that Beeman had purchased it in August, 1997, for $24,000. Instead, he stated that there was no other sale of that property within the year. Similarly, with the third comparable, 1119 Ward Street, Hoffman reported as sold for $64,000 a month earlier, without disclosing that Beeman had purchased that property for $12,700 in November, 1997. There, too, he stated that there was no other sale of the property within the year. In place of these suspect sales, the plaintiffs' expert found ten lower price comparable sales within the year prior to Hoffman's appraisal. The range of values estimated by that expert was between $25,000 and $45,000.

Hoffman views this evidence as establishing, at worst, nothing more than simple negligence, not a conspiratorial agreement to commit fraud, or fraud itself, or a violation of the CPA. Inaccuracies in his appraisals, he says, do not suffice to show a conspiratorial agreement between him and Beeman; nor, in the absence of any evidence that any of the plaintiffs ever saw or relied upon his appraisals, did they establish actual fraud. Finally, Hoffman argues; given the absence of any evidence that he dealt directly with any of the plaintiffs, the CPA simply does not apply.

### (3) *Conspiracy*

We have defined a civil conspiracy as "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Green v. Wash. Sub. San. Comm'n,* 259 Md. 206, 221, 269 A.2d 815, 824 (1970). Although the

notion of a tortious conspiracy was derived from the common law criminal conspiracy and each requires proof of an agreement, the tort plaintiff must show more than just an unlawful agreement. The plaintiff must also prove the commission of an overt act, in furtherance of the agreement, that caused the plaintiff to suffer actual injury. *See Alleco, Inc. v. Harry & Jeanette Weinberg Foundation, Inc.,* 340 Md. 176, 189–91, 665 A.2d 1038, 1044–45 (1995) and cases cited there. The tort actually lies in the act causing the harm; the agreement to commit that act is not actionable on its own but rather is in the nature of an aggravating factor. That is why this Court, in *Alleco,* held that civil conspiracy " 'is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff.' " *Alleco, supra,* 340 Md. at 189, 665 A.2d at 1044–45 (quoting *Alexander & Alexander, Inc. v. B. Dixon Evander & Associates, Inc.,* 336 Md. 635, 645 n. 8, 650 A.2d 260, 265 n. 8 (1994)).

■ There is little doubt here that Beeman, with the assistance of Wood, committed overt acts that were intended to defraud, and did defraud, the nine plaintiffs and that the plaintiffs suffered actual harm from that conduct. That is not really contested by Hoffman. The only question, as to Hoffman, is whether the evidence sufficed to establish that he joined and helped to implement an agreement to achieve that result. In that regard, we pointed out in *Western Md. Dairy v. Chenowith,* 180 Md. 236, 243, 23 A.2d 660, 664 (1942) that a conspiracy may be proved by circumstantial evidence, "for in most cases it would be practically impossible to prove a conspiracy by means of direct evidence alone." We explained:

"Conspirators do not voluntarily proclaim their purposes; their methods are clandestine. It is sufficient if the proven facts and circumstances, pieced together and considered as a whole, convince the court that the parties were acting together understandingly in order to accomplish the fraudulent scheme. Thus a conspiracy may be established by inference from the nature of the acts complained of, the individual and collective interest of the alleged conspirators, the situation and relation of the parties at the time of the

commission of the acts, the motives which produced them, and all the surrounding circumstances preceding and attending the culmination of the common design."

*Id.* at 243–44, 23 A.2d at 664. *See also Daugherty, supra,* 264 Md. at 292, 286 A.2d at 101.

Viewing the evidence in that context and in a light most favorable to the plaintiffs, who prevailed at trial on this issue, we are convinced that it sufficed, under even a clear and convincing evidence standard, to permit the jury reasonably to have concluded that Hoffman acted together with Beeman and Wood to accomplish the fraudulent scheme. We are not dealing here with just with some isolated inaccuracies in individual appraisals or with honest differences of opinion between Hoffman and the plaintiffs' expert over some fine points of appraisal practice. The evidence—clear and convincing—showed a pattern in all of the appraisals of:

(1) actual knowledge by Hoffman in some cases and the ability to know in others, that Beeman had purchased the properties only months earlier for a fraction of what Hoffman appraised them for;

(2) an attempt by Hoffman to justify the huge inflation, at least in part, by assuming that major improvements would be made to the properties when, in fact, many of those improvements were not made and, had Hoffman made a reasonable effort to investigate that critical assumption, he would have known, or had reasonable grounds to suspect, that they were not made; [11] and

11. Hoffman stated that "sometimes" he would go back and verify whether required repairs had been made, but sometimes he did not do so, believing it to be the underwriter's problem. The problem with that is that, in each case here, he knew that his appraisal was far in excess of what Beeman had paid for the property only a few months earlier and he justified his appraisal on the premise that the property had been "rehabbed"—that substantial improvements and repairs had been made to it in the meanwhile. He thus knew that if those repairs and improvements were not made, the appraisal would be grossly inaccurate. This was not a case of checking to see if a dishwasher was working or a closet had been painted. There was substantial evidence that the very repairs and improvements needed to justify the grossly

(3) a further attempt by Hoffman to justify the actual appraisal by positing as comparable the sale of distant properties that were not at all comparable, in part by including material misstatements as to both the physical characteristics of some of those properties and their actual proximity to the subject properties, and by ignoring recent sales at much lower prices of properties more like and in greater proximity to the subject properties.

The end result of this consistent pattern, documented in one form or another in each of the appraisals, was a seemingly automatic appraisal, in each case, at or just in excess of whatever the contract price happened to be. Overarching all of this were the facts that Hoffman derived 99% of his income from appraisals done for Irwin, that he knew if the appraisal did not match the contract price, the deal would fall through, thereby depriving Wood of her commission and Beeman of his profit, that in at least two cases, he actually consulted Beeman with respect to which comparables to use and used the high-price sales recommended by Beeman even though they were not truly comparable, and that, in direct violation of HUD and ethical requirements applicable to appraisers, he deliberately destroyed all of his notes once Beeman's activities came to public attention. From that spoliation alone the jury was entitled to infer that those notes would have been detrimental to Hoffman's defense, that they would not have supported what he said from the witness stand.

Some of these departures, viewed in isolation, might be regarded as simple negligence, as Hoffman argues, but "pieced together and considered as a whole," they suffice to show that Hoffman was aware of what Beeman was doing, that he understood that Beeman's scheme could not work unless he produced appraisals at or above the inflated contract price, and that he knowingly participated in that scheme by providing those appraisals. He was dependent on Wood for

inflated appraisal were not made and that, had Hoffman made a reasonable investigation, he would have known that they were not made.

his livelihood, Wood was dependent on people like Beeman for her livelihood, and Hoffman made it all work.

Hoffman argues that this case is similar to *Electronics Store v. Cellco,* 127 Md.App. 385, 732 A.2d 980 (1999), *cert. denied,* 356 Md. 495, 740 A.2d 613 (1999), and *Cavalier Mobile Homes v. Liberty Homes,* 53 Md.App. 379, 454 A.2d 367 (1983), *cert. denied,* 295 Md. 736 (1983), in which the Court of Special Appeals held that there was insufficient evidence to support a finding of conspiracy under Maryland antitrust law. The quantum and quality of evidence in this case is much greater than that presented in those cases, however, and they are therefore distinguishable.

### (4) *Fraud*

To prove an action for civil fraud based on affirmative misrepresentation, the plaintiff must show that (1) the defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation. *See Nails v. S & R,* 334 Md. 398, 415, 639 A.2d 660, 668 (1994); *VF Corp., supra,* 350 Md. at 703, 715 A.2d at 193 (1998); *Environmental Trust v. Gaynor,* 370 Md. 89, 97, 803 A.2d 512, 516 (2002).[12]

---

12. It has long been clear that "[f]raud may consist in a suppression of the truth as well as in the assertion of a falsehood." *Schnader v. Brooks,* 150 Md. 52, 57, 132 A. 381, 383 (1926). We described the elements of an action based on fraudulent concealment of material facts in *Green v. H & R Block,* 355 Md. 488, 525, 735 A.2d 1039, 1059 (1999): "(1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment." *See also Levin v. Singer,* 227 Md. 47, 64, 175 A.2d 423, 432 (1961)

■ Hoffman contends that there was no evidence that any of the plaintiffs actually relied on his appraisals and that, in any event, because of an FHA warning that the purpose of the appraisal was to determine the value of the property for mortgage insurance purposes and that the buyer should independently evaluate the reasonableness of the purchase price, they had no right to rely on his appraisal. The Court of Special Appeals rejected both of those arguments on the premise of indirect reliance—that the plaintiffs were aware that if the appraisal was less than the contract price, they would have the right to cancel the contract and that, when that option was not afforded them because of the inflated appraisal, they relied and had a right to rely on the fact that the property was worth what they were paying for it. That kind of indirect reliance, Hoffman argues, does not suffice.

Hoffman is correct with respect to two of the factual underpinnings of his argument. There is no evidence that any of the plaintiffs actually read Hoffman's appraisal. It is also clear that each of them entered into the contract of sale with Beeman prior to Hoffman even being employed to make the appraisal, so the appraisal could not have affected their decision to enter into the purchase contract. There are several other important facts to be considered, however. As the Court of Special Appeals noted, the plaintiffs were aware of the HUD requirement that, if an appraisal showed the value of the property to be less than the contract price, they had an absolute right to cancel the contract, and Hoffman also knew that to be the case, although he said he was unaware that such an option was provided for in the contract itself. Wood testified that, if the appraisal did not support the contract price, she would have notified the plaintiffs of that fact, and the plaintiffs each testified that, had they been advised of the true value of the property and the reasons why it was less than the contract price, they would, in fact, have cancelled the contracts.

In each contract of sale was an "FHA Amendatory Clause" that provided, in relevant part:

"It is expressly agreed that ... Buyer shall not be obligated to complete the purchase of the Property described herein or incur any penalty by forfeiture of monies on deposit or otherwise, unless the Buyer has been given, in accordance with HUD/FHA or VA requirements, a written statement issued by the ... Direct Endorsement Lender setting forth the appraised value of the Property of not less than the purchase price. Buyer shall have the privilege and option of proceeding with consummation of the Contract without regard to the amount of the appraised valuation. The appraised valuation is arrived at to determine the maximum mortgage [HUD] will insure. HUD does not warrant the value nor the condition of the Property. Buyer should satisfy himself/herself that the price and the condition of the Property are acceptable." [13]

Although that clause makes clear that the buyer may not rely on the appraisal as a warranty either against defects in the property or that the value of the property is precisely as stated in the appraisal, it does permit the buyer to rely on the fact that, unless stated otherwise, the value is at least equal to the contract price. It could have no other effect. The buyer may not cancel the contract if the property is appraised at or above the contract price, but only if informed that the appraised value is less than the contract price. Significantly, if in that event if the buyer elects to cancel, his/her deposit or down payment is not forfeited, but must be returned. The cancellation, in other words, is without cost to the buyer. Also implicit in that clause is the ability of the buyer, if the appraisal is less than the contract price, to attempt to renegotiate the price, so that it can be brought in line with the appraisal. Indeed, with the appraisal effectively fixing the maximum contract price in an FHA transaction, even Beeman, who had a fairly substantial investment in the properties, would have had some incentive to renegotiate the matter.[14]

---

13. Irwin was a direct endorsement lender.

14. The record indicates that Beeman took out 100% commercial mortgages to finance his purchase of the properties, that the mortgages

The phony appraisals prepared for Wood by Hoffman, as part of the fraudulent scheme, precluded the plaintiffs from exercising those options. In proceeding with settlement, they each necessarily, even if implicitly, relied on the fact that Hoffman had correctly valued the property as at least equal to the contract price.

### (5) *Consumer Protection Act*

■ Maryland Code, § 13–303 of the Commercial Law Article, which is part of the State CPA, prohibits a person from engaging in an unfair or deceptive trade practice in the sale of consumer realty. An "unfair or deceptive trade practice" includes any false or misleading statement or representation which has the capacity, tendency, or effect of deceiving or misleading consumers and encompasses a representation that consumer realty has a characteristic that it does not have or is of a particular standard or quality that is not the case. Commercial Law Art. § 13–301. Section 13–408 of that article provides for a private cause of action to recover for loss or injury sustained as the result of a practice forbidden by the CPA.

Citing *Morris v. Osmose Wood Preserving,* 340 Md. 519, 541, 667 A.2d 624, 635 (1995), Hoffman points out that, for the CPA to apply, the deceptive practice "must occur in the sale or offer for sale to consumers." His contention is that he did not sell any consumer realty or offer any consumer services to any of the plaintiffs, but merely provided appraisals to Irwin, for Irwin's benefit.

*Morris* involved an action by homeowners, in part under the CPA, against the manufacturer of plywood that the builder used in constructing the roofs of their homes and that subsequently deteriorated. We affirmed the dismissal of the CPA claim on the ground that any misrepresentations made by the manufacturer regarding the plywood were made to the build-

---

carried 14% interest, were due in two years, and were personally guaranteed by Beeman and his wife. He had a clear financial interest in not holding the properties too long.

er, not the plaintiff-buyers of the homes, and that there was "no allegation that the defendants were in any way involved in selling, offering, or advertising the townhouses that the plaintiffs bought." *Morris, supra,* 340 Md. at 542, 667 A.2d at 636.

In holding that the deceptive practice must occur in the sale to consumers, we were careful to point out that we did not mean "that the only entity that can engage in a deceptive practice is one who directly sells or offers to sell to consumers" and that "[i]t is quite possible that a deceptive trade practice committed by someone who is not the seller would so infect the sale or offer for sale to a consumer that the law would deem the practice to have been committed 'in' the sale or offer for sale." *Id.* at 541, 667 A.2d at 635. For the reasons noted above, the evidence more than sufficed to show that Hoffman's erroneous and misleading appraisals directly "infected" the sales at issue here. They would not have proceeded to closing absent those appraisals. He was an integral part of the entire scheme of deceptive trade practices committed in the sale of consumer realty.

### B.  *Non–Economic Damages—Physical Injury Rule in Fraud Cases*

Hoffman, Wood, and Irwin complain about the award of $145,000 in non-economic damages to each of the plaintiffs in the absence of any evidence that any of the plaintiffs suffered any physical injury from the alleged fraud or deception. They aver that this Court has traditionally precluded the recovery of emotional damages in the absence of some evidence of an accompanying or consequential physical injury and that the lower courts erred in relaxing that rule in this case. The plaintiffs counter that the physical injury requirement applies only in negligence cases and not to intentional torts such as fraud.

To set the stage, although all of the plaintiffs testified that the problems they encountered with their homes caused them emotional distress—sadness, anger, humiliation, embarrassment, stress—only one of them, Haley, testified as to any physical manifestation of those emotions. Haley, who died

prior to trial, stated in deposition testimony that, whenever he began thinking about his problems, he would get headaches and would vomit. Haley also admitted that he was a diabetic and was required to have kidney dialysis three times a week, and that those conditions were not caused by the stress emerging from the problems with his house.

At the end of the case, Hoffman, Irwin, and Wood moved for judgment on non-economic damages, arguing that there was no corroborating evidence of emotional injury. Those motions were denied. In its written instructions on the fraud count, the court told the jury that, in addition to any economic injury suffered by the plaintiffs, it could consider any non-economic injury that it found to be "proximately and directly caused" and that, in determining non-economic damages, the jury could consider "any mental pain, anguish, humiliation, nervousness, stress and insult to which the Plaintiff [was] subjected and which was a direct result of the conduct of one or more Defendants." The award, the court added, must not be based on guesswork but must fairly and adequately compensate the Plaintiff for the injury sustained. Hoffman, Irwin, and Wood excepted to those instructions on the ground that they did not go far enough—that "the jury should have been instructed that any claimed injury in the nature of non-economic damages must be capable of objective determination" and that "the evidence must be detailed enough to give you a basis upon which to quantify the injury." The court disagreed and gave no further instruction.

We recounted the history and rationale of the physical injury requirement in *Vance v. Vance*, 286 Md. 490, 408 A.2d 728 (1979). We observed that, in earlier times, courts did not recognize a specific duty to refrain from the negligent infliction of emotional distress and that, as a result, recovery of damages solely for mental distress was not permitted. Instead, we said, "damages for mental distress had a parasitic status; recovery was dependent upon an immediate physical injury accompanying an independently actionable tort." *Id.* at 496, 408 A.2d at 731. Over time, we added, courts generally and this Court in particular began to modify that "accompany-

ing physical impact" rule, because it led to arbitrary results, and to create in its place what we termed the "modern rule," which permitted recovery for negligent infliction of mental distress if a physical injury *resulted from* the commission of the tort, regardless of impact. *See Green v. T.A. Shoemaker & Co.*, 111 Md. 69, 73 A. 688 (1909); *Bowman v. Williams*, 164 Md. 397, 165 A. 182 (1933); *Mahnke v. Moore*, 197 Md. 61, 77 A.2d 923 (1951).

Although courts were not averse to eliminating the requirement of an accompanying physical impact, they were reluctant to eliminate entirely the requirement of some consequential physical injury as a condition to the award of damages for emotional or mental distress. There still remained concern that mental distress may be too easily simulated and that there was no practical standard for measuring such distress; thus, recovery for emotional injury would not be allowed based on the plaintiff simply saying, "This made me feel bad; this upset me." The "modern rule," allowing recovery of damages for emotional distress if there was at least a "consequential" physical injury, we regarded as a proper balance—a "sufficient guarantee of genuineness that would otherwise be absent in a claim for mental distress alone." *Vance, supra*, 286 Md. at 498, 408 A.2d at 732. It simply applied the same rule to this kind of injury that applied to other kinds as well—recovery could be had if the injury was objectively ascertainable and was shown to be a provable consequence of the wrongful conduct.

That rule itself underwent a significant expansion when we gave an elastic definition to the word "physical." In *Vance*, we noted that, for purposes of applying the "modern rule," the term "physical" was not used in its ordinary dictionary sense, but instead "is used to represent that the injury for which recovery is sought is capable of objective determination." *Id.* at 500, 408 A.2d at 733–34. In that regard, we observed that it had been held to include such things as depression, inability to work or perform routine household chores, loss of appetite, insomnia, nightmares, loss of weight, extreme nervousness and irritability, withdrawal from socialization, fainting, chest pains,

headaches, and upset stomachs. *Id.* at 501, 408 A.2d at 734, and cases there. Examined analytically, that had more to do with proving, rather than defining, this kind of injury. *See also Belcher v. T. Rowe Price,* 329 Md. 709, 621 A.2d 872 (1993); *Faya v. Almaraz,* 329 Md. 435, 620 A.2d 327 (1993); *Smith v. Borello,* 370 Md. 227, 804 A.2d 1151 (2002).

Relying on an earlier decision, *Laubach v. Franklin Square Hosp.,* 79 Md.App. 203, 556 A.2d 682 (1989), *aff'd on other grounds,* 318 Md. 615, 569 A.2d 693 (1990), the Court of Special Appeals concluded that the physical injury rule, even as so modified, does not apply in a tort case based on intentional conduct, as "proof that the defendant committed the wrong alleged is sufficient reassurance that the plaintiff's claimed emotional distress is not feigned, because the wrongful conduct ordinarily would cause emotional distress in the victim." *Hoffman, supra,* 155 Md.App. at 321, 843 A.2d at 197. The court thus held that there was "no need for the plaintiff to support his claim of emotional distress with objective evidence of a physical injury." *Id.*

Although it is true that most of the cases in which the physical injury rule has been discussed or applied have been cases founded on negligence and the Court has therefore often expressed the rule as applicable in negligent tort cases, this Court has never clearly limited the rule to negligence actions or carved out an exception to it for torts based on fraud. The cases from this Court relied on by the intermediate appellate court in *Laubach—H & R Block, Inc. v. Testerman,* 275 Md. 36, 338 A.2d 48 (1975), *abrogated on other grounds by Owens–Illinois v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992), and *Zeigler v. F St. Corp.,* 248 Md. 223, 235 A.2d 703 (1967)—do not support its contrary conclusion.

For one thing, both *Testerman* and *Zeigler* were negligence cases, not intentional tort cases, so there was no occasion to determine whether the physical injury requirement applied in intentional tort cases. In both cases, the Court merely held, in this regard, that *physical impact* was not a prerequisite to mental anguish damages, which, under the "modern rule" adopted much earlier in *Green, supra,* 111 Md. 69, 73 A. 688,

and *Bowman, supra,* 164 Md. 397, 165 A. 182, is true. The Court expressly confirmed in *Testerman,* however, that there still must be "clearly apparent and substantial physical injury," and that, in consequence of that requirement, "Maryland decisions have generally denied compensation for mental anguish resulting from damage to property." *Testerman, supra,* 275 Md. at 48–49, 338 A.2d at 55. The *Testerman* court cited *Zeigler* in support of that proposition. *Zeigler,* indeed, made the same point, that "ordinarily, there can be no recovery for mental suffering, resulting from damage done to property," with the caveat that "[where] the act occasioning the injury to the property is inspired by fraud, malice, or like motives, mental suffering is a proper element of damage." *Zeigler, supra,* 248 Md. at 226, 235 A.2d at 705.

The passage relied on from *Zeigler,* which was basically a trespass case with an added negligence count, was intended as an exception to the general rule that emotional damages were not recoverable at all where the tortious injury is only to property. We indicated that, where the injury to the property was motivated by fraud or malice, emotional damages *could* be recovered, even in the absence of a physical *impact.* We did not say, or imply, that they could be recovered in the absence of some consequential physical injury of the extended variety noted in *Vance.* Indeed, the evidence in *Zeigler* was that the plaintiff, whose home was inundated by dirt and debris due to the conduct of his neighbor, actually died from the stress caused by what was happening to his home.

This Court has never addressed whether, or under what conditions, emotional damages may be recovered in an action for fraud. Courts around the country seem to be split on the issue. *See* Steven J. Gaynor, *Fraud Actions: Right to Recover for Mental or Emotional Distress,* 11 A.L.R.5th 88 (1993). Most courts view fraud as an economic tort in the nature of a breach of contract and thus generally apply the measure of compensatory damages applicable to a breach of contract— pecuniary loss. *See Webster v. Woolford,* 81 Md. 329, 330–31, 32 A. 319, 319 (1895) ("The action, it is true, is in the nature of an action *for tort,* but it is a tort founded on a breach of

contract, and there being no question as to exemplary damages, the rule as to the measure of damages is the same as in cases for breach of contract in regard to the sale of property"); *see also* RESTATEMENT (SECOND) OF TORTS, § 549 (Measure of Damages for Fraudulent Misrepresentation) (1977 & Supp. 1998).

In close conformance with that view, some courts have held that emotional damages are not recoverable at all in an action for fraud.[15] Other courts have allowed such damages on the premise that the defendant should be liable for the ordinary and proximate consequences of his/her/its actions.[16] Some courts have allowed emotional damages only when the defendant's conduct is wanton, outrageous, shows malice, or when there is accompanying physical injury.[17] Others have allowed such damages where emotional injury was foreseeable, where the defendant should have been aware that its fraudulent conduct would cause that kind of distress.[18] There clearly is no universal view.

---

**15.** *See Moore v. Slonim,* 426 F.Supp. 524, 527 (D.Conn.1977), *aff'd by oral op.,* 562 F.2d 38 (2nd Cir.1977); *Cornell v. Wunschel,* 408 N.W.2d 369, 382 (Iowa 1987); *Jourdain v. Dineen,* 527 A.2d 1304, 1307 (Me. 1987); *Walsh v. Ingersoll–Rand Co.,* 656 F.2d 367, 370–71 (8th Cir. 1981) (applying Missouri law); *Stich v. Oakdale Dental Center, P.C.,* 120 A.D.2d 794, 501 N.Y.S.2d 529, 531 (N.Y.App.Div.1986); *Citicorp Intern. Trading v. Western Oil & Refining,* 790 F.Supp. 428, 436 (S.D.N.Y.1992) (applying New York law); *Sparrow v. Toyota of Florence, Inc.,* 302 S.C. 418, 396 S.E.2d 645, 648 (1990).

**16.** *See Holcombe v. Whitaker,* 294 Ala. 430, 318 So.2d 289, 292–93 (1975); *McNeill v. Allen,* 35 Colo.App. 317, 534 P.2d 813, 819 (1975).

**17.** *See Ellis v. Crockett,* 51 Haw. 45, 451 P.2d 814, 820 (1969); *Food Fair, Inc. v. Anderson,* 382 So.2d 150, 154–55 (Fla.Dist.App.1980); *S.H. Inv. & Development Corp. v. Kincaid,* 495 So.2d 768, 770 (Fla.Dist.App. 1986); *Umphrey v. Sprinkel,* 106 Idaho 700, 682 P.2d 1247, 1258 (1983); *Crowley v. Global Realty, Inc.,* 124 N.H. 814, 474 A.2d 1056, 1058 (1984); *Emmons v. Merrill Lynch, Pierce, Fenner & Smith,* 532 F.Supp. 480, 485 (S.D.Ohio 1982); *McRae v. Bolstad,* 32 Wash.App. 173, 646 P.2d 771, 775 (1982), *aff'd, remanded on other grounds,* 101 Wash.2d 161, 676 P.2d 496 (1984).

**18.** *See Kilduff v. Adams, Inc.,* 219 Conn. 314, 593 A.2d 478, 484–85 (1991).

■ We see no reason to create an exception for fraud cases to the carefully crafted rule enunciated in *Vance* and the subsequent cases. It is consistent with the more liberal approach adopted by other courts; it remains a fair balance that permits recovery of damages for emotional injury which, by reason of either an accompanying or consequential "physical" injury, is objectively ascertainable; and it avoids the dilemma of requiring some physical manifestation where the misrepresentation is negligent but not where it is deliberate, even though the consequences to the plaintiff may be precisely the same. The Court of Special Appeals erred in excusing the plaintiffs from having to show some physical manifestation as a condition to recovery of damages for purely emotional injury.

■ Because eight of the plaintiffs offered no evidence of any physical manifestation of their claimed emotional stress, the defense motions on that issue should have been granted. The uniform $145,000 awards to them must be stricken. As Haley *did* present sufficient evidence of some physical manifestation, an award of non-economic damages to him would be possible under a correct jury instruction. We cannot affirm the award to him because the instruction, to which a proper objection was made, was wrong. As we have indicated, Haley died prior to trial. Whether his estate still can or might desire to pursue a retrial on that issue we cannot determine, but we shall not foreclose it.[19]

### C. *Evidentiary Standard for Proof of Fraud Damages*

The trial court gave both written and oral instructions to the jury. In ¶ 4 of its written general instructions, the court told the jury that the plaintiffs were required to prove fraud and conspiracy to commit fraud by clear and convincing evidence, that that burden applied to "the elements of the

---

19. Hoffman also complains about the inclusion of injury to credit as part of non-economic damages. As we are striking the non-economic damages for other reasons, that complaint is moot and need not be addressed.

claim," but that "[i]ndividual items of damage attributable to these claims must only be provided by a preponderance of the evidence." Later, in its written instructions regarding Question 6 on the verdict sheet, which dealt with damages upon a finding of fraud or conspiracy to commit fraud, the court iterated that the plaintiffs had the burden "to prove by a preponderance of the evidence each item of injury or loss claimed to be sustained and that such injury was sustained as a proximate result of the Defendant or Defendants' conduct." That instruction was also given orally to the jury.

At the conclusion of the oral instructions, Irwin and Wood, but not Hoffman, lodged the following objection:

"Instruction No. 4 indicates that Plaintiffs only need to satisfy the jury by a preponderance of the evidence on the damages for the conspiracy and fraud claims. We take exception to that. The clear and convincing test applies to all elements of the claims and so on that basis we believe that the clear and convincing standard should be assigned to damages as well."

The trial judge did not agree and responded that "I'm going to ride with what I've got as far as that goes."

Irwin and Wood raised this issue on appeal, but the Court of Special Appeals, relying on *Casey v. Roman Catholic Archbishop of Baltimore,* 217 Md. 595, 143 A.2d 627 (1958) and *Sydnor v. State,* 365 Md. 205, 776 A.2d 669 (2001), *cert. denied,* 534 U.S. 1090, 122 S.Ct. 834, 151 L.Ed.2d 714 (2002), held that it was waived because, although an objection was properly made to general instruction No. 4, no objection was made to Question 6 or the oral restatement of it. *Hoffman, supra,* 155 Md.App. at 326–28, 843 A.2d at 200–01. Those cases are not in point, and we think that the intermediate appellate court erred in its finding of waiver.

Maryland Rule 2–520(e) requires, as a condition to seeking appellate review of a jury instruction, that the party object promptly after the instruction is given and "stat[e] distinctly the matter to which the party objects and the

grounds of the objection." The purpose of the rule, as we have made patently clear on a number of occasions, is "to enable the trial court to correct any inadvertent error or omission in the oral [or written] charge, as well as to limit the review on appeal to those errors which are brought to the trial court's attention." *Fisher v. Balto. Transit Co.*, 184 Md. 399, 402, 41 A.2d 297, 298 (1945). In that manner, "the trial judge is afforded 'an opportunity to amend or supplement his charge if he deems an amendment necessary.'" *Sergeant Co. v. Pickett*, 283 Md. 284, 288, 388 A.2d 543, 546 (1978) (quoting in part from *State v. Wooleyhan Transport Co.*, 192 Md. 686, 689–90, 65 A.2d 321, 322 (1949)). Although we have often said that objections must be precise, the purpose of precision is "that the trial court has no opportunity to correct or amplify the instructions for the benefit of the jury if the judge is not informed of the exact nature and grounds of the objection." *Fearnow v. C & P Telephone*, 342 Md. 363, 378, 676 A.2d 65, 72 (1996).

Irwin and Wood clearly presented to the trial court their view that every element of an action of fraud, including damages, had to be proved by clear and convincing evidence. Although counsel briefly referenced Question 4, the objection, unmistakably, was to allowing the jury to find damages based on a mere preponderance of the evidence, and the judge seemed to understand that point but simply disagreed. In *Casey*, the plaintiff objected to an initial jury instruction on damages, whereupon the court gave a supplemental instruction, to which no objection was made. On appeal, the plaintiff complained only about a deficiency in the supplemental instruction, which we held was waived. In *Sydnor*, the defendant, who did not object to the initial instruction, complained about a supplemental restatement of that instruction. Both the Court of Special Appeals and this Court held that the objection was preserved. The objection here was clearly preserved. The problem for Irwin and Wood is that the objection has no merit.

In order to recover damages in an action of fraud, the plaintiff must prove, by clear and convincing evidence, among other things, that he/she/it "suffered compensable injury resulting from the misrepresentation." *VF Corp., supra,* 350 Md. at 703, 715 A.2d at 193 (quoting *Nails, supra,* 334 Md. at 415, 639 A.2d at 668); *see also Environmental Trust, supra,* 370 Md. at 97, 803 A.2d at 516. What must be proved by that standard is that *some* compensable injury arose from the deceit, because *a* compensable injury arising by reason of the fraud is an element of the tort. We have never held, however, that the *measure* of the damages required to compensate for that injury must be proved by clear and convincing evidence. Indeed, in *Empire Realty Co. v. Fleisher,* 269 Md. 278, 284, 305 A.2d 144, 148 (1973), we drew a distinction between liability for damages, on the one hand, and the measure of those damages, on the other, noting that, as to the latter, though not the former, Maryland applies "the flexible approach to damages for fraud and deceit."

We have required a higher standard of proof in fraud cases because of the seriousness of the allegations—an imputation of dishonesty sometimes bordering on criminal behavior. *See Everett v. Baltimore Gas & Elec.,* 307 Md. 286, 301, 513 A.2d 882, 890 (1986), *overruled on other grounds by Coleman v. Anne Arundel County Police Dept.,* 369 Md. 108, 797 A.2d 770 (2002). That rationale has no relevance to the proof of specific elements of loss or injury, however, especially in tort cases. There is no reason to require a greater quantity or higher quality of evidence to show the amount of economic loss or the nature or degree of emotional injury caused by fraudulent conduct than that caused by negligent conduct. The thing to be proved in either case is the same. The trial court did not err in permitting "individual items of damage" attributable to the fraud and conspiracy claims to be proved by a preponderance of evidence.

### D. *Punitive Damages*

As we have previously observed, to establish the tort of fraud, the plaintiff must prove, among other things, that the

defendant made a false representation to the plaintiff and that "its falsity was *either* known to the defendant *or that the representation was made with reckless indifference as to its truth.*" (Emphasis added). *Environmental Trust, supra,* 370 Md. at 97, 803 A.2d at 516 (quoting *VF Corp., supra,* 350 Md. at 703, 715 A.2d at 192–93). Reckless indifference as to truth arises when the defendant makes the representation even though aware that he does not know whether it is true or false—where he knows that he lacks knowledge as to its truth or falsity—and nonetheless makes the representation without regard to that lack of knowledge. *See Ellerin v. Fairfax Savings,* 337 Md. 216, 232, 652 A.2d 1117, 1125 (1995).

▮ Although that alternative mental state of reckless indifference suffices to support a finding of fraud and an award of compensatory damages that flow from it, we made clear in *Ellerin* that it does *not* suffice to justify an award of punitive damages. We pointed out that, in *Owens–Illinois v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992), *reconsideration denied,* 325 Md. 665, 602 A.2d 1182 (1992), the Court modified the standard for an award of punitive damages and that, under the new standard, as applied in fraud cases, *actual* knowledge of falsity "include[s] the type of deliberate wrongdoing and evil motive that has traditionally justified the award of punitive damages," but that, where the fraud is based on the alternative state of reckless disregard, "the traditional basis for the allowability of punitive damages is not present." *Ellerin, supra,* 337 Md. at 235, 652 A.2d at 1126. What is needed to support an award of punitive damages is conscious and deliberate wrongdoing. The Court thus concluded that only "a person's actual knowledge that his statement is false, coupled with his intent to deceive another by means of that statement, constitute the 'actual malice' required for the availability of punitive damages." *Id.* at 240, 652 A.2d at 1129. The *Ellerin* court recognized and confirmed, however, that "actual knowledge" did include " 'the wilful refusal to know.' " *Id.* at 235, n. 10, 652 A.2d at 1126, n. 10 (quoting *Zenobia, supra,* 325 Md. at 462, n. 23, 601 A.2d at 654, n. 23). *Zenobia* made the same point:

"Actual knowledge, however, does include the wilful refusal to know. *See, e.g., State v. McCallum,* 321 Md. 451, 458–61, 583 A.2d 250, 253–55 (1991) (Chasanow, J., concurring) (' "[K]nowledge" exists where a person believes that it is probable that something is a fact, but deliberately shuts his or her eyes or avoids making reasonable inquiry with a conscious purpose to avoid learning the truth.') Therefore, a defendant cannot shut his eyes or plug his ears when he is presented with evidence of a defect and thereby avoid liability for punitive damages."

*Zenobia, supra,* 325 Md. at 462, n. 23, 601 A.2d at 654, n. 23. *See also Le Marc's v. Valentin,* 349 Md. 645, 653, n. 4, 709 A.2d 1222, 1226, n. 4 (1998).

Aware of *Zenobia* and *Ellerin,* the trial court concluded that, although there was sufficient evidence that Hoffman, Irwin, and Wood acted with reckless disregard as to whether statements made to the plaintiffs, including the appraisals prepared by Hoffman, were true or false, there was not sufficient evidence to establish that they had actual knowledge of the falsity of those statements. It was on that finding that the court granted partial judgment to those defendants and withdrew the punitive damage claims as to them from the jury.

On the plaintiffs' cross-appeal, the Court of Special Appeals reversed that ruling. As to Wood and Irwin, the court concluded that the evidence introduced to show liability for fraud, which "show[ed] that Wood participated in creating a number of false impressions for the buyers, by words and conduct amounting to partial and fragmentary disclosures," *Hoffman, supra,* 155 Md.App. at 305, 843 A.2d at 188, was "sufficient to send the issue of punitive damages to the jury." *Id.* at 342, 843 A.2d at 209. That conclusion, in turn, was drawn from evidence that (1) at the initial meetings with the plaintiffs, Wood treated Beeman, whom she knew to be the seller, as if he was the buyer's representative, (2) she misused her good faith estimates to set or increase the sales price for the properties, and (3) she misled the buyers into thinking that it was proper for Beeman to be arranging gift letters.

*Id.* As to Hoffman, the court believed that Hoffman knew that he was furnishing inaccurate appraisals.

Two issues are presented: first, whether the Court of Special Appeals was correct in concluding that there was sufficient evidence of actual knowledge, of either the affirmative or willful blindness variety, on the part of Wood and Hoffman, based on their own conduct; and second, if not, whether Wood, Irwin, and Hoffman can be held liable for punitive damages based on their participation in the conspiracy with Beeman, whose liability for punitive damages based on his conduct is unquestioned. For reasons to be explained, we need not decide either issue.

The first issue hinges, to some extent, on the very subtle distinction between willful blindness to fraudulent activity, which suffices as actual knowledge, and reckless disregard for truth or falsity, which does not. Willful blindness occurs when a person " 'has his suspicion aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance.' " *State v. McCallum, supra,* 321 Md. at 459–60, 583 A.2d at 253–54 (Chasanow, J. concurring) (quoting *United States v. Jewell,* 532 F.2d 697, 700 (9th Cir.1976)). A recklessly indifferent person, on the other hand, "has actual knowledge that he or she [does] not know whether the statement [is] true or false, but, with reckless indifference to the truth, [makes] the statement with the intent of deceiving the listener." *Le Marc's, supra,* 349 Md. at 654, 709 A.2d at 1227. The subtle gradient that makes the former more culpable is that the person actually suspects that the representation is false and chooses not to investigate, whereas the latter simply does not know and does not care.

There are two dilemmas here. The first is that the trial court acted inconsistently on this issue. It withdrew the punitive damage claim as to Hoffman, Irwin, and Wood because it concluded that there was legally insufficient evidence of actual knowledge on their part that the fraudulent representations they made were, in fact, false. Yet, it concluded that there was sufficient evidence of such actual knowledge to

submit the issue to the jury with respect to the fraud count itself. Ordinarily, that might not be a problem, but here it is. In its instructions on the fraud count, the court stated that, to recover, the plaintiffs had to prove, by clear and convincing evidence, that the representations made by them were false and "that its falsity was known to the Defendant at the time of the representation." Earlier, in explaining "knowledge," the court told the jury:

"Now, in determining whether someone had knowledge of something you may look at all the evidence in the case and use your own common sense in determining whether that person *really knew* what was going on. You may draw reasonable inferences from facts but you must take care to avoid guess work or speculation. You may consider the willful *and knowing* violation of a statute or the willful *and knowing* violation of a *known* duty as evidence of such knowledge. You may also consider whether the person involved *willfully refused or deliberately refused to look at the facts in the face of obvious facts because such willful refusal to know in the face of obvious facts may be deemed knowledge. If you find that a person was willfully blind or made a consci[ous] effort not to know something th[e]n you may determine under all the facts in the case that the person actually knew it.*"

(Emphasis added).

Those instructions, when juxtaposed, presented to the jury only the "actual knowledge" variety of fraud. Although the court included "willful blindness" as an aspect or part of actual knowledge, as, under our recent case law it was obliged to do, it did not permit the jury to find fraud on the basis of reckless indifference or reckless disregard. In denying the defendants' motions for judgment and submitting that instruction, thereby permitting the jury to determine fraud based solely on "actual knowledge," the court necessarily concluded that there was legally sufficient evidence to permit such a finding to be made by clear and convincing evidence. That conclusion is inconsistent with the contrary finding made regarding the punitive damage claim.

■ The relevant question, of course, is whether the evidence actually did suffice to show actual knowledge on the part of Hoffman and Wood, which brings us to the second dilemma—that of preservation. At the conclusion of the evidence, Hoffman, Wood, and Irwin filed memoranda in support of their respective motions for judgment and jury instructions. As to the fraud count, Hoffman complained only about the lack of evidence of reliance by the plaintiffs on his appraisals. He did not argue a legal insufficiency of evidence regarding his actual knowledge that the appraisals were false and misleading. That was true as well with his motion for judgment NOV, filed after the jury returned its verdicts; his complaint as to Count II for fraud was only that the plaintiffs had failed to prove reliance. Irwin and Wood, as to the fraud count, argued in their memorandum only that "willful failure to know" does not constitute actual knowledge and that there was no evidence that the plaintiffs relied on any of Wood's representations. Other than their mistaken effort to have the court, as a matter of law, reject "willful failure to know" as a form of actual knowledge, they also did not argue an insufficiency of evidence of actual knowledge. That was true as well with respect to their motion for judgment NOV.

Before us, these defendants make essentially the same limited arguments as to the fraud count that they made in the trial court. Hoffman complains about the lack of reliance on his appraisals. Irwin and Wood complain about the evidentiary standard used to determine damages arising from the fraud. None of them have argued that there was legally insufficient evidence of actual knowledge to preclude submission of the fraud claim to the jury.

To attack the evidence of actual knowledge with respect only to the punitive damage claim is, itself, inconsistent. If they are satisfied, at this point, that there was legally sufficient evidence to sustain the jury's finding of fraud based on the very kind of actual knowledge that would also support a claim for punitive damages, they have no enduring claim that it was insufficient to submit the punitive damage claim to the jury, since both rested on precisely the same evidence as to

actual knowledge.  For that reason, we shall affirm the determination by the Court of Special Appeals that the punitive damage claims should have been submitted to the jury.  Had we reached the issue, we would have found the evidence sufficient to show the kind of actual knowledge required for punitive damages.

### E.   *Limited Remand*

█ Having concluded that the claim for punitive damages against Hoffman, Irwin, and Wood was wrongfully withheld from the jury, the Court of Special Appeals determined that the plaintiffs were entitled to a partial new trial limited to that claim—whether punitive damages were warranted against those defendants.  *Hoffman, supra,* 155 Md.App. at 343, 843 A.2d at 210.  The court held that, if the jury finds the evidence admitted at that trial is sufficient to establish the plaintiffs' entitlement to punitive damages, a separate hearing on the proper amount of those damages would have to be held. *Id.*

Hoffman, Irwin, and Wood complain that such a limited remand would be terribly prejudicial in that consideration of punitive damages would be detached from the evidence and theories pertaining to the underlying fraud.  They urge that, if there is to be a new trial, the judgment entered on the fraud count should be stricken and the new trial should include both liability and damages.  The plaintiffs respond, of course, that requiring a full retrial as to liability and compensatory damages would be unfair to them.  They note as well that they had suggested in the trial court that the jury answer two conditional questions that would have avoided this problem but that the defendants rejected that approach.

Maryland Rule 8–604(b) permits an appellate court, if it concludes that error affects a severable part of the action, to reverse or modify the judgment as to that severable part, remand that part for further proceedings, and affirm the other parts of the judgment.  That is precisely what the Court of Special Appeals did in this case.  In *Caldor v. Bowden,* 330 Md. 632, 625 A.2d 959 (1993), after concluding that, because a

punitive damage award had been based, in part, on verdicts for compensatory damages that were stricken through judgments NOV, the punitive award could not stand, we applied that Rule and remanded the case for a limited retrial on just the punitive damages. *See also Bowden v. Caldor,* 350 Md. 4, 710 A.2d 267 (1998); *Alexander & Alexander, Inc. v. B. Dixon Evander & Assoc.,* 88 Md.App. 672, 596 A.2d 687 (1991), *cert. denied,* 326 Md. 435, 605 A.2d 137 (1992). There was no error in ordering the limited remand as to punitive damages.

### F. *Attorneys' Fees*

As noted, the Court of Special Appeals struck the award of $195,591 in attorneys' fees entered as ancillary relief under the CPA and remanded that issue as well for reconsideration. Its decision was based on the premise that, as an award of attorneys' fees under the CPA must take into account the amount of recovery on the substantive claims and there was the prospect of an additional punitive damage recovery against Hoffman, Wood, and Irwin, the trial court should revisit the matter based on what the jury might do with the punitive damage claim. *Hoffman, supra,* 155 Md.App. at 344–45, 843 A.2d at 211. The intermediate appellate court, for "guidance," also suggested that the trial court erred in directing that there be a dollar-for-dollar reduction in that award for whatever the plaintiffs' attorneys recovered under their contingent fee agreement with the plaintiffs. *Id.* at 345, 843 A.2d at 211–12.

Irwin and Wood have made no complaint about the attorney fee award. Hoffman complains that the remand was inappropriate in that the award is justified only under Count III—the CPA claim—and that it cannot be based on punitive damages awardable only under Count II for fraud.

Hoffman is correct. Maryland Code, § 13–408(a) of the Commercial Law Article authorizes a private cause of action "to recover for injury or loss sustained by him as the result of a practice prohibited by this title." Section 13–408(b) provides that a person who brings an action "to recover for injury or loss *under this section* and who is awarded damages

may also seek, and the court may award, reasonable attorney's fees." (Emphasis added). The fee award is limited to the CPA action and may not be based on additional recoveries under other causes of action. *See Barnes v. Rosenthal,* 126 Md.App. 97, 103–04, 727 A.2d 431, 434 (1999); *Mercedes–Benz v. Garten,* 94 Md.App. 547, 568–69, 618 A.2d 233, 243 (1993). Punitive damages may not be awarded in an action brought under § 13–408. In *Golt v. Phillips,* 308 Md. 1, 12, 517 A.2d 328, 333 (1986), we concluded that the private remedy under that section was "purely compensatory" and "contains no punitive component." Because the remand for reconsideration of attorneys' fees was based solely on the prospect of punitive damages being awarded under the fraud count, it was erroneous.[20]

**JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS (1) TO MODIFY JUDGMENTS FOR ALL PLAINTIFFS BY STRIKING AWARD OF $145,000 FOR NON–ECONOMIC DAMAGES OR TO REMAND TO CIRCUIT COURT FOR BALTIMORE CITY FOR THAT PURPOSE; (2) TO REMAND CASE AS TO PLAINTIFF CARL HALEY FOR FURTHER PROCEEDINGS AS TO NON–ECONOMIC DAMAGES; (3) TO REMAND CASES TO CIRCUIT COURT FOR BALTIMORE CITY FOR NEW TRIAL AS TO PUNITIVE DAMAGES AGAINST PETITIONERS HOFFMAN, IRWIN AND WOOD; AND (4) TO OTHERWISE AFFIRM JUDGMENTS ENTERED BY CIRCUIT COURT FOR BALTIMORE CITY. COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID 3/4 BY PETITIONERS HOFFMAN, IRWIN, AND WOOD AND 1/4 BY RESPONDENT PLAINTIFFS.**

---

**20.** There might have been a basis for remand to consider lowering the award as to all plaintiffs except Haley, given our conclusion that the judgments in favor of those plaintiffs must be amended to strike the award of non-economic damages, but none of the parties has sought that relief.