**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 24-1345**

_____

ALIA SALEM AL-SABAH,

        Plaintiff – Appellee,

   v.

WORLD BUSINESS LENDERS, LLC,

        Defendant – Appellant,

  and

ROBERT WILLIAMS; UPTOWN COMMERICAL CAPITAL; KENNETH WILLIAMS; SHARESTATES INVESTMENTS, LLC; IRM PLAZA, LLC,

        Defendants.

_____

**No. 24-1382**

_____

ALIA SALEM AL-SABAH,

        Plaintiff – Appellant,

   v.

WORLD BUSINESS LENDERS, LLC,

        Defendant – Appellee,

  and

ROBERT WILLIAMS; UPTOWN COMMERICAL CAPITAL; KENNETH WILLIAMS; SHARESTATES INVESTMENTS, LLC; IRM PLAZA, LLC,

Defendants.

_____

Appeal from the United States District Court for the District of Maryland, at Baltimore. Stephanie A. Gallagher, District Judge.  (1:18-cv-02958-SAG)

_____

Argued:  October 22, 2025                                     Decided:  November 26, 2025

_____

Before AGEE, THACKER, and RICHARDSON, Circuit Judges.

_____

Affirmed in part, reversed in part, and remanded with instructions by published opinion. Judge Agee wrote the opinion, in which Judge Thacker and Judge Richardson joined.

_____

**ARGUED:**  Stephen J. Rosenfeld, MCDONALD HOPKINS LLC, Chicago, Illinois, for Appellant/Cross-Appellee.    Michael Broughton MacWilliams, VENABLE LLP, Baltimore, Maryland, for Appellee/Cross-Appellant.  **ON BRIEF:**  Patrick O'Meara, MCDONALD HOPKINS LLC, Chicago, Illinois, for Appellant/Cross-Appellee. Elizabeth C. Rinehart, Catherine G. Ottenritter, VENABLE LLP, Baltimore, Maryland, for Appellee/Cross-Appellant.

_____

2

AGEE, Circuit Judge:

Between 2014 and 2016, Jean Agbodjogbe—a Baltimore restaurateur—defrauded Alia Al-Sabah—a member of the Kuwaiti royal family—out of nearly $7.8 million. While Al-Sabah thought Agbodjogbe was using the six-figure wire transfers that she regularly sent him to purchase and renovate real estate investments on her behalf, he instead funneled most of her money almost exclusively to entities he controlled. Through those entities, he purchased several commercial properties in Baltimore, a condo in New York City as a residence for Al-Sabah's daughter ("NYC condo"), and—unbeknownst to Al-Sabah—a home for him and his family in Pikesville, Maryland ("Pikesville home").

After Al-Sabah eventually recognized that all was not as promised and Agbodjogbe evaded her attempts to communicate, she sued him for fraud in the United States District Court for the District of Maryland. In addition to seeking damages, Al-Sabah requested that the court impose a constructive trust over the properties Agbodjogbe purchased with the fraudulently obtained funds. Days after she sued Agbodjogbe, Al-Sabah filed a Notice of Lis Pendens ("Notice of Lis Pendens" or "Notice"). As we discuss below, the Notice, if properly filed, would have imputed constructive notice of the litigation to a future purchaser who would then take the title to the property subject to its outcome. The Notice, however, was improperly filed and thus ineffective.

During discovery in that case, Al-Sabah learned that World Business Lenders, LLC ("WBL") funded three loans for Agbodjogbe, each secured by real property Agbodjogbe acquired using funds he obtained from Al-Sabah: (1) a $600,000 loan secured by the NYC condo in May 2016 ("Loan One"); (2) a $1.2 million loan to refinance Loan One, also

3

secured by the NYC condo in August 2016 ("Loan Two"); and (3) a $360,000 loan secured by the Pikesville home in March 2017 ("Loan Three"). WBL progressively learned more about Agbodjogbe's questionable actions during the underwriting process for each loan.

Foreseeing the difficulty of executing on a potential judgment against Agbodjogbe, Al-Sabah also sued WBL in the District of Maryland, contending it aided and abetted his fraud. In essence, her theory was that WBL acted as Agbodjogbe's "getaway driver" by burdening the ill-gotten real estate with liens to secure Agbodjogbe's loans. In this way, Al-Sabah argues WBL aided Agbodjogbe by converting the misappropriated money from real estate equity to liquid cash, thereby preventing her recovery on her potential judgment against Agbodjogbe.

Following a bench trial, the district court found partially in favor of Al-Sabah, awarding her $469,990 in compensatory damages and $235,000 in punitive damages as to Loan Three. Specifically, the district court found that WBL was willfully blind to, and substantially assisted, Agbodjogbe's fraudulent scheme as it related to the Pikesville home when it funded Loan Three. As to the other two loans, the district court found for WBL, concluding that it was not willfully blind as to them.

WBL appeals the district court's judgment as it relates to Loan Three, and Al-Sabah cross-appeals with respect to Loans One and Two.

On review, we conclude there is no reversible error as to the judgments in favor of WBL. As to the judgment for Al-Sabah on Loan Three, however, we conclude that the district court's decision has material factual and legal errors that essentially converted conduct that, at most, amounted to simple negligence into aiding and abetting fraud.

4

Therefore, we will affirm the judgment of the district court on Loans One and Two, reverse as to Loan Three, and remand for entry of final judgment for WBL in all respects.

## I.

To properly focus Al-Sabah's aiding and abetting claim, we briefly recount the facts of the underlying fraud Agbodjogbe perpetrated against Al-Sabah, and her suit against him, even though neither is directly before us in this appeal. Then we turn to Agbodjogbe's relations with WBL, which form the basis for Al-Sabah's claims against it.

## A.

While visiting the United States in 2014, Al-Sabah met Agbodjogbe at a small restaurant named Nailah's Kitchen that he owned and operated in Baltimore, Maryland.[1] Shortly after Al-Sabah returned to Kuwait, Agbodjogbe told her that he wanted to expand his restaurant, and proposed converting his existing business into a new one named N&A Kitchen, LLC ("N&A Kitchen"), which Al-Sabah believed stood for "Nailah's and Alia's Kitchen." Although Al-Sabah had never participated in a business venture, she agreed to invest $150,000 in N&A Kitchen for fifty percent ownership. Agbodjogbe emailed Al-Sabah background information about him, such as his driver's license and a federal income tax return for Nailah's Kitchen, and relayed his willingness to "go through a background check if necessary." *Al-Sabah II*, 2024 WL 263579, at *2. Al-Sabah declined, perceiving

---

[1] We largely recite the facts from the district court's findings of fact following the bench trial in this case. *Al-Sabah v. World Bus. Lenders, LLC*, No. 18-cv-2958-SAG, 2024 WL 263579 (D. Md. Jan. 24, 2024) ("*Al-Sabah II*").

5

Agbodjogbe to be honest and transparent. Agbodjogbe then sent Al-Sabah articles of organization, an operating agreement, and a contribution agreement for N&A Kitchen, which had been prepared by his attorney. Thinking all was in order, Al-Sabah wired her $150,000 investment to N&A Kitchen's newly formed bank account.

Events escalated quickly from there for an unsuspecting Al-Sabah. Along with the new restaurant venture, Agbodjogbe persuaded Al-Sabah to invest in purchasing commercial real estate in Baltimore. Al-Sabah agreed so long as the properties were titled in a to-be-formed entity that she alone would own named 9 Jewels, LLC ("9 Jewels"). Agbodjogbe formed 9 Jewels, but unknown to Al-Sabah, he—not Al-Sabah—owned and controlled it.

Almost monthly, Agbodjogbe requested six-figure wire transfers from Al-Sabah. Sometimes, he claimed he needed money to renovate N&A Kitchen. Other times, he presented her with a new property investment opportunity. He also facilitated the purchase of a condo for her daughter in New York City. And he offered to buy a building for an aftercare program for Muslim students and property to build a cemetery for local Muslims who could not afford burial costs—all with Al-Sabah's money.

With little to no inquiry or hesitation, Al-Sabah agreed at each turn, trusting that Agbodjogbe was using the money as intended. He somewhat did. For example, he did purchase the NYC condo in 9 Jewels' name, and her daughter did live there for a period, but 9 Jewels was owned by Agbodjogbe alone. Perhaps unsurprisingly by this point, Agbodjogbe redirected most of Al-Sabah's money to his own purposes. Relevant to this

appeal, Agbodjogbe used Al-Sabah's money to purchase the Pikesville home as his personal residence for $469,990 in January 2015.

When all was said and done in July 2016, Al-Sabah had transferred nearly $7.8 million over 22 months to either N&A Kitchen or 9 Jewels. She believed nearly all of it would be used to benefit 9 Jewels; in reality, Agbodjogbe alone owned and controlled it all. And the money was gone by the time Al-Sabah finally realized Agbodjogbe's scheme.

Agbodjogbe evaded Al-Sabah's attempts to communicate with him, and on March 17, 2017, Al-Sabah sued him for fraud in the United States District Court for the District of Maryland. *Al-Sabah v. Agbodjogbe*, No. 1:17-cv-730-SAG (D. Md.) ("*Al-Sabah I*"). She sought monetary damages and, among other things, for the district court to impose a constructive trust over the NYC condo and Pikesville home because Agbodjogbe purchased them with money he fraudulently obtained from her. Amended Complaint at 21, *Al-Sabah I*, ECF No. 76. Three days later, Al-Sabah filed the Notice of Lis Pendens in the Circuit Court for Baltimore County.[2] J.A. 719–47. The Notice, which included the district court complaint as an exhibit, explained the nature of her suit against Agbodjogbe and, among other things, that he used the money fraudulently obtained from her to purchase the Pikesville home. Only later did Al-Sabah realize that the Notice was incorrectly recorded

---

[2] Lis pendens means "pending lawsuit" and refers "to the jurisdiction, power, or control which a court acquires over property involved in a lawsuit pending its continuance and final judgment." *DeShields v. Broadwater*, 659 A.2d 300, 305 (Md. 1995). Under the doctrine of lis pendens, "an interest in property acquired while litigation *affecting title to that property is pending* is taken subject to the results of that pending litigation." *Id.* (emphasis added) (citations omitted).

against the wrong property (not the Pikesville home) and thus did not provide constructive notice to potential future purchasers. *See* J.A. 747; *see also* Md. R. 12-102(b).

In January 2020, a jury found for Al-Sabah, and the district court entered judgment in her favor for $7,895,277.50. *Al-Sabah I*, ECF No. 288 (No. 1:17cv730). The court, however, declined to impose a constructive trust over either property. *Id.*, ECF No. 279.

B.

WBL is an alternative business lender that provides small businesses that have difficulty procuring loans from traditional lending sources with "short-term, high-cost loans secured by real estate." *Al-Sabah II*, 2024 WL 263579, at *7. Recognizing that "the needs of small businesses tend to be more urgent[,]" WBL makes funds "available to the borrower . . . often within 7–14 days from application." J.A. 486. To assess credit risk, WBL considers internal guidelines that "focus[] on metrics designed to predict performance over a short time period." *Id.* It sometimes deviates from these guidelines as it "takes a discretionary approach to underwriting each prospective loan[.]" *Al-Sabah II*, 2024 WL 263579, at *7; *see also* J.A. 487 ("[A]s each credit presents its own unique set of facts and circumstances, exceptions to guidelines can be expected on a case-by-case basis[.]").

As the district court explained:

The process of issuing and funding a loan at WBL involves (1) review and evaluation of the business applying for the loan; (2) valuation of the real estate pledged as collateral supporting the loan; (3) acquisition of title insurance for the collateral; (4) presentation to, and approval by, at least one person of a three-person investment committee; (5) credit approval issued by

8

the credit department; (6) generation and signature of a funding package handled by the closing department; and ([7]) funding of the loan.

*Al-Sabah II*, 2024 WL 263579, at *7.

Between December 2015 and March 2017, Agbodjogbe, on behalf of N&A Kitchen or 9 Jewels, applied for four loans from WBL, three of which were funded. The circumstances surrounding the underwriting and approval of these loans form the basis of Al-Sabah's theory of WBL's aiding and abetting liability here. We address each below.

1.

WBL first entered the picture in December 2015 when Agbodjogbe applied for a $350,000 loan to be secured by a property he purchased with money he obtained from Al-Sabah ("Loan Zero").[3] While reviewing the application, a junior credit analyst at WBL flagged several large incoming wire transfers in N&A Kitchen's bank records. WBL identified "numerous character concerns" associated with the loan and flagged the file as a "high fraud risk." *Al-Sabah II*, 2024 WL 263579, at *8 (citation omitted). The analyst requested more information about the source of the wires from Agbodjogbe's loan broker, Kenneth Williams, who told the analyst that the funds were from his business partner. Later, the analyst learned during a call with Agbodjogbe that the wire transfers were purportedly "gifts" from Agbodjogbe's business partner, who "belong[ed] to a wealthy family in Kuwait." *Id.* The analyst requested and received an IRS Form 3520 gift tax return prepared and signed by David Leichter—Agbodjogbe's certified public accountant

---

[3] For ease of reference, we adopt the naming convention for the loans used by the parties and the district court.

("CPA")—that reflected Agbodjogbe reported more than $1 million in gifts from Al-Sabah to the IRS. *See* J.A. 513.

Even so, the credit analyst and Yasemin Fakioglu, then a WBL vice president, suspected that Agbodjogbe might have been engaged in money laundering because the transfer amounts did not square with N&A Kitchen's revenues. When they relayed this concern to Robert Pardes, WBL's Chief Operating Officer ("COO") at the time, he told them that financial regulations require Agbodjogbe's depository bank to investigate and clear the large deposits, and WBL "can only assume that the depository bank has exercised the requisite due diligence." *Al-Sabah II*, 2024 WL 263579, at *9 (citation omitted). The IRS gift tax returns eliminated any remaining concern that Pardes had of money laundering, "because money laundering is a discrete activity, and here the deposits are being reported to the IRS and the federal government directly." *Id.*

Still, Pardes urged his subordinates to speak with Agbodjogbe's CPA. In doing so, Leichter told them that the wire transfers were "legitimate" and "legal" gifts and confirmed that Agbodjogbe's "entire story with respect to the wires all checks out." *Id.* (cleaned up). The investment committee then approved the loan, finding that the identified "character concerns" were "all mitigated" because WBL "confirmed that the funds are gift funds through a professional who filed the tax returns." *Id.* (cleaned up). Agbodjogbe, however, withdrew the application before Loan Zero was funded.

## 2.

In May 2016, Agbodjogbe applied for Loan One—a $600,000 loan, which he intended to use to remodel the upper level of N&A Kitchen and purchase a building for a

10

new location, secured by the NYC Condo. During another conversation with the WBL credit analyst who handled Loan Zero four months earlier, Agbodjogbe provided the same explanation for the large wire transfers—one of which was identified as coming from "ALSHAIKHA ALIA SALEM AL-S"—that he had given for Loan Zero: he "receives the money as gifts from a longtime friend and . . . has reported the money to the IRS as gifts." *Al-Sabah II*, 2024 WL 263579, at *10. WBL was not concerned about the source of the transfers because the gift tax filings and Leichter's representations from Loan Zero were sufficient to show that these transfers were legitimate gifts. Agbodjogbe had also disclosed that he used some of the transferred money to buy the NYC condo, and the analyst requested and received proof of purchase of that property.

WBL deviated a bit from its internal guidelines in approving Loan One. For example, one underwriting metric that measures the borrower's ability to repay a loan exceeded the ordinary limit. But the projected revenues that Agbodjogbe provided for his restaurants satisfied WBL that he would be able to perform on the loan as required. It also received a short form accountant representation letter from Leichter, as opposed to a long-form attorney opinion letter that it ordinarily required for loans of this type that exceed $200,000. *Id.* at *11.

As discussed below, the long-form attorney letter would have provided WBL an array of assurances, such as the validity of N&A Kitchen's organization, Agbodjogbe's authority to act on its behalf, and the absence of pending litigation that could negatively affect his performance of the loan. *See, e.g.*, J.A. 643–45. But WBL found Leichter's letter "served its purpose" for Loan One by representing that: (a) Agbodjogbe had consulted an

11

outside professional before taking a high-interest loan; and (b) Agbodjogbe owned 9 Jewels (the owner of the NYC condo) and N&A Kitchen (the borrower). J.A. 214–15. Importantly, "there were no other facts inconsistent with [the CPA's] representation either in title and all the due diligence that was done[.]" J.A. 215.

On May 27, 2016, WBL funded Loan One, secured by the NYC condo.

3.

Agbodjogbe applied for Loan Two in July 2016, seeking to refinance Loan One with a new $1.2 million loan from WBL, still secured by the NYC condo. WBL performed another round of due diligence—collecting updated revenue projections, bank statements, and this time, an attorney opinion letter—and, in a third interview, the same credit analyst again asked Agbodjogbe about the wire transfers. Although WBL noted some inconsistencies in Agbodjogbe's representations for Loans One and Two, and his revenue projections did not pan out as he had previously represented, WBL determined that these occurrences were "commonplace and typical among WBL's borrowers[.]" *Al-Sabah II*, 2024 WL 263579, at *12. Accordingly, WBL funded Loan Two, secured by the NYC condo on August 26, 2016. Four months later, Agbodjogbe refinanced the loan with a third-party lender and, as a result, fully paid off Loan Two.

4.

Agbodjogbe returned to WBL for a third and final loan in March 2017, this time pledging the Pikesville home as collateral. Loan Three was $360,000 ostensibly so that Agbodjogbe could renovate a new N&A Kitchen location. WBL received a title report for the Pikesville home that reflected that the title was vested solely in Agbodjogbe. The title

12

report also identified the Notice of Lis Pendens from Al-Sabah's suit against Agbodjogbe, filed days earlier, as one of seven judgments or liens associated with the property.[4] WBL sought to resolve the Notice because it ordinarily would not close on a loan secured by property with a lis pendens. *Al-Sabah II*, 2024 WL 263579, at *14.

Fakioglu asked Agbodjogbe about the lis pendens and learned that he and his attorneys were working on resolving it, along with the other judgments identified in the title report. Fakioglu relayed that information to at least three other WBL employees, including the title department manager. Along the way, someone in the closing department conducted a PACER search to try to identify the litigation underlying the lis pendens and identified Al-Sabah's suit against Agbodjogbe. *Id.*

Meanwhile, the investment committee approved Loan Three, subject to certain conditions including, obtaining title insurance, removal of all "prior owner judgments," a primary residence additional diligence ("PRAD") call (so Agbodjogbe knew pledging his home as collateral had risks), and receiving a long-form attorney opinion letter. J.A. 792. WBL again deviated somewhat from its guidelines but was comfortable doing so given "the free and clear nature of the collateral" and Agbodjogbe's positive payment history.

One of WBL's managing directors, also its "head of credit," testified at trial that, after reviewing the initial title report, WBL "asked the title company to take another look

---

[4] The Notice itself was not attached to the title report. The only attached document was a printout of the Maryland docket webpage, which reflects a case captioned "*Al Sabah v. Agbodjogbe, et al*" was filed in the Circuit Court for Baltimore County on March 20, 2017. J.A. 759. It also identifies "Alia Salem Al Sabah," of Kuwait as the plaintiff and Agbodjogbe as one of several defendants. Lastly, it shows that a document titled "Notice of lis pendens from Baltimore County" had been filed on March 20, 2017. J.A. 760.

13

and omit [the title issues] that had belonged to the prior owner or omit [the title issues] that don't belong." *Al-Sabah II*, ECF No. 214, at 112. By that point, the lis pendens notation had been relayed to Pardes, who typically would have investigated further only if it remained unresolved after the title insurance process cleared up any "blemishes to title[.]" J.A. 217. But "shortly after" Pardes learned about it, WBL received an updated title report that omitted the Notice as it "was found not to apply to the subject property." *Id.* In other words, the title company would insure title to the Pikesville home, resolving all known blemishes, including the lis pendens notation, so Pardes did not inquire further.

WBL also received a long-form attorney opinion letter on Agbodjogbe's behalf that represented, among other things, that "*after due inquiry*," no "*threatened or pending litigation*" *posed a risk to the borrower's (N&A Kitchen) or guarantor's (Agbodjogbe) ability to perform their obligations as to Loan Three*. J.A. 796 (emphasis added). In WBL's view, the title policy and unconditional opinion letter—both conditions of loan approval—resolved any concerns that litigation might affect the Pikesville home. With all its other closing conditions met, WBL waived the PRAD call because Agbodjogbe was "a repeat customer" and "paid WBL multiple times on bigger loans." *Al-Sabah II*, 2024 WL 263579, at *15. WBL funded Loan Three on March 30, 2017, secured by the Pikesville home.

C.

While her suit against Agbodjogbe was still pending, Al-Sabah separately sued WBL, raising various causes of action related to its lending relationship with Agbodjogbe.[5]

---

[5] The district court had jurisdiction under 28 U.S.C. § 1332(a)(2).

14

Relevant to this appeal, Al-Sabah alleged that WBL aided and abetted Agbodjogbe's fraudulent scheme by funding Loans One, Two, and Three in exchange for a priority lien on the pledged collateral.[6] As noted earlier, her theory was that WBL "monetized" Agbodjogbe's fraud by encumbering the collateral real estate with liens to secure its loans, which effectively transformed Al-Sabah's misappropriated funds from real property equity to liquid proceeds and ultimately obstructed her ability to recover the secured real estate.

After a four-day bench trial, the district court found partially in favor of Al-Sabah. It concluded that WBL was willfully blind to Agbodjogbe's fraud—an essential element of aiding and abetting—when it funded Loan Three but not Loans One and Two. Then the district court turned to the second element and concluded that WBL substantially assisted Agbodjogbe in carrying out the fraud when it funded Loan Three. Finding WBL thus liable for aiding and abetting fraud as to Loan Three, the district court awarded Al-Sabah $469,990 in compensatory damages, which was her out-of-pocket loss for the Pikesville home,[7] and $235,000 in punitive damages. *Al-Sabah II*, 2024 WL 263579, at \*27; J.A. 375.

---

[6] Al-Sabah also asserted other state-law claims, including unjust enrichment, for which the district court found in favor of WBL. Those claims are not at issue on appeal.

[7] WBL does not separately appeal the discrepancy between the district court's compensatory damages award of $469,990 and the loan of only $360,000. Nonetheless, it is hard to comprehend how Al-Sabah's damages, premised on WBL's lien on the Pikesville home, could exceed $360,000—the amount of the secured loan. In other words, WBL would be entitled only to $360,000 if Agbodjogbe had defaulted on the loan and it foreclosed on the home, assuming Al-Sabah's equitable lien under the lis pendens was invalid. Al-Sabah could have enforced her separate judgment lien on any proceeds from the foreclosure over $360,000. But if the lis pendens was valid and attached to the property without defect, then Al-Sabah would have had an equitable lien on the Pikesville home and WBL would have taken subject to that lien.

15

## II.

WBL timely appealed as to Loan Three, Al-Sabah timely cross-appealed as to Loans One and Two, and we have jurisdiction under 28 U.S.C. § 1291. We review a district court's judgment rendered following a bench trial "under a mixed standard of review— factual findings may be reversed only if clearly erroneous, while conclusions of law are examined de novo." *Chavez-Deremer v. Med. Staffing of Am., LLC*, 147 F.4th 371, 398 (4th Cir. 2025) (cleaned up).

## III.

Maryland recognizes aiding and abetting as an independent tort claim. *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038, 1049 (Md. 1995). Liability for aiding and abetting flows if a person "by any means . . . encouraged, incited, aided or abetted the act of the direct perpetrator of the tort." *Duke v. Feldman*, 226 A.2d 345, 347 (Md. 1967). To prevail, the plaintiff must prove: (a) a primary actor committed a tort; (b) the defendant knew of, or was willfully blind to, that tortious act; and (c) the defendant substantially assisted the actor in bringing about its occurrence.[8] *Sutton v. FedFirst Fin. Corp.*, 126 A.3d 765, 792 (Md. Ct. Spec. App. 2015); *see also Alleco*, 665 A.2d at 1050.

---

[8] As for the first element, Al-Sabah had to prove that Agbodjogbe—the primary actor—committed fraud, the underlying tort. To do so, she was required to prove by clear and convincing evidence that Agbodjogbe knowingly made a false representation with the purpose to defraud her, she justifiably relied on that misrepresentation, and she suffered injury from that misrepresentation. *Md. Env't Tr. v. Gaynor*, 803 A.2d 512, 516 (Md. 2002). At trial, WBL stipulated to all but one of these elements of fraud, only arguing that Al-Sabah was not justified in relying on Agbodjogbe's misrepresentations. The district (Continued)

16

For the second element—and the only one we need to address to dispose of this appeal—Al-Sabah had to prove that WBL knew about, or was willfully blind to, Agbodjogbe's fraudulent activity.[9] *See Hoffman v. Stamper*, 867 A.2d 276, 302 (Md. 2005). Al-Sabah proceeded on a theory of willful blindness, which "occurs when a person has his suspicion aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance." *Id*. (citation omitted). Said differently, "a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and *who can almost be said to have actually known the critical facts*." *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) (emphasis added).

The district court found that WBL was not willfully blind to Agbodjogbe's fraud when it funded Loans One and Two but was willfully blind when it funded Loan Three. Al-Sabah challenges the former conclusion, and WBL challenges the latter. As we explain, the evidence does not show that WBL was willfully blind when it funded any of the loans as a matter of law. Accordingly, we affirm the district court as to Loans One and Two and reverse as to Loan Three.

---

court mostly disagreed with WBL, concluding that Al-Sabah's reliance was justified in nearly all respects. For some reason, Al-Sabah argues on cross-appeal that the district court erred in finding that her reliance was not always justified. *See* Al-Sabah Opening Br. 49–52. We see no merit in that argument and are otherwise satisfied that Al-Sabah proved Agbodjogbe's fraud as the predicate tort.

[9] WBL also argues that the district court erred by concluding that it substantially assisted Agbodjogbe's fraud by funding Loan Three. Because we hold that WBL neither knew of nor was willfully blind to that fraud—an essential element of aiding and abetting—we need not reach the substantial assistance element.

A.

We first consider and reject Al-Sabah's argument that the district court erred by concluding that WBL was not willfully blind to Agbodjogbe's fraud when it funded Loans One and Two. "[L]ower-level employees" at WBL "first discovered" several large incoming wire transfers to N&A Kitchen while underwriting Loan Zero in December 2015.[10] *Al-Sabah II*, 2024 WL 263579, at *20. And, as Al-Sabah points out, WBL flagged the transfers as "very large unusual deposits," and designated Agbodjogbe as a "high fraud risk" with "numerous character concerns." Al-Sabah Opening Br. 43 (quoting *Al-Sabah II*, 2024 WL 263579, at *22). In short, its suspicions of dubious actions were aroused.

The willful blindness inquiry requires that we look to what WBL did "to avoid confirming a high probability of wrongdoing." *Glob.-Tech Appliances, Inc.*, 563 U.S. at 769. Like the district court, we conclude that "there is no evidence that WBL deliberately omitted making further enquiries about these concerns." *Al-Sabah II*, 2024 WL 263579, at *20. Starting with Loan Zero, rather than brushing that information aside, WBL sought answers. It asked Agbodjogbe and his loan broker about the source of the transfers and learned that they were gifts from Agbodjogbe's wealthy Kuwaiti business partner. But WBL did not simply accept these representations at face value. It requested and received CPA-prepared gift tax returns that confirmed Agbodjogbe reported the transfers as gifts to the IRS under penalty of perjury. Even after those documents assuaged Pardes' concerns,

---

[10] Like the district court, we conclude that "[a]lthough Loan Zero did not ultimately fund, WBL's *activities* during its underwriting of Loan Zero are highly relevant to the issue of knowledge and willful blindness of Agbodjogbe's fraud on Al-Sabah." *Al-Sabah II*, 2024 WL 263579, at *20 n.28 (emphasis added).

18

he still required his subordinates to speak with Leichter, who in turn confirmed Agbodjogbe's representations. Based on this investigation, WBL was no longer concerned that Agbodjogbe was engaged in illegal activity.

WBL "replicated in some fashion" these actions when underwriting Loans One and Two. *Id.* It sought and received proof that Agbodjogbe purchased the NYC condo and a professional opinion in the form of Leichter's CPA letter, which confirmed Agbodjogbe owned 9 Jewels and N&A Kitchen. The evidence reflects, and the district court correctly found, that "[a]t no point during the underwriting for Loans One and Two did WBL uncover any other suspicious bank activity that created any new questions about the source of the large wires into Agbodjogbe's bank accounts." *Id.* at *20 n.29. Simply put, there is no evidence WBL avoided learning about Agbodjogbe's possible fraud, much less that it had reason to believe he purchased the NYC condo with misappropriated money.

Yet Al-Sabah contends that WBL did not do enough and that it should have been suspicious (or at least more suspicious) that Agbodjogbe was engaged in fraud based on the large wire transfers, Agbodjogbe's contradictory statements to WBL about his businesses and their revenue, his ability (or lack thereof) to make some loan payments, and his character for truthfulness. According to Al-Sabah, WBL's failure to investigate these matters further demonstrates its willful blindness. At its core, this argument is no more than a post hoc critique of the way WBL runs its business and confuses possible negligence with the entirely separate concept of aiding and abetting fraud.

Perhaps a more traditional lender might have scrutinized these issues more than WBL did here; perhaps not. But WBL "takes an unconventional approach to lending[.]"

19

*Id.* at \*20. It provides short-term secured loans to "businesses that cannot or do not qualify for loans from banks and other traditional lending sources." *Id.* at \*7. Inconsistencies in loan applications are "commonplace and typical among WBL's borrowers," and WBL's decision to lend to high-risk borrowers "with 'very difficult complex credits' reflects only WBL's own high-risk tolerance." *Id.* at \*12, \*20 (citation omitted); *see also* J.A. 101–02 (explaining that WBL deviates from its internal guidelines and its reliance on projected revenues is "a common element of [its] underwriting" because "depending on what the business is going to do with the funds, that's a part of the growth in revenue").

Just because WBL *might* have discovered Agbodjogbe's fraud *if* it had investigated any of these matters further does not mean that WBL was willfully blind for not doing so. In arguing that WBL should have done a more thorough investigation than it did, Al-Sabah argues that "[t]o require any more direct awareness of the fraudulent particulars would collapse the willful blindness standard into one of actual knowledge." Al-Sabah Reply Br. 9. In reality, accepting this argument would transform willful blindness into a mere negligence standard. After all, willful blindness "is a *form* of knowledge, not a *substitute* for knowledge." *State v. McCallum*, 583 A.2d 250, 255 (Md. 1991) (Chasanow, J., concurring). Creative arguments about what more could have been done do not demonstrate that WBL ever knew, or should have known, something nefarious was taking place.

We thus discern no error in the district court's conclusion that WBL was not willfully blind to Agbodjogbe's fraud when it funded Loans One and Two and affirm the district court's judgment as to those claims.

20

B.

We now turn to WBL's contention that it was not willfully blind to Agbodjogbe's fraud when it funded Loan Three. For WBL to have been willfully blind it must have suspected Agbodjogbe's fraud—that he purchased the Pikesville home, the collateral for Loan Three, using money he fraudulently obtained from Al-Sabah—but "deliberately omit[ted] to make further enquiries, because [it] wishe[d] to remain in ignorance." *Hoffman*, 867 A.2d at 302.

As we discuss below, the district court concluded WBL was willfully blind as to Loan Three, but that conclusion was both legally and factually erroneous.

1.

Briefly recounting the district court's discussion on this point, it found WBL's discovery of the Notice of Lis Pendens on the Pikesville home's title report as particularly significant—"WBL's personnel had knowledge of Agbodjogbe's alleged wrongdoing and could make the requisite connections to Al-Sabah and the Pikesville [home], but WBL chose not to investigate so that it could quickly close and fund Loan Three." *Al-Sabah II*, 2024 WL 263579, at *23. And "at least eight days before WBL funded Loan Three on March 30, 2017, [WBL] knew that Agbodjogbe had just been sued for fraud by the very person who sent him the large wires and that person, Al-Sabah, contested title to the very property Agbodjogbe pledged as collateral for Loan Three." *Id.* at *21. So, the district court concluded that "the evidence in the record clearly and convincingly shows that WBL was willfully blind to Agbodjogbe's fraud when it elected to fund Loan Three." *Id.*

21

Underpinning that conclusion was the district court's determination that WBL's reliance on the title insurance policy was unjustified because WBL initiated the reissuance of the policy, while it "was aware that the lis pendens applied to the Pikesville [home.]" *Al-Sabah*, 2024 WL 263579, at *22. The court also rejected Pardes' explanation that he "declined to investigate the specifics of the lis pendens any further based on a questionable and improbable belief that the lis pendens applied to a different property." *Id.* at *23. It emphasized what it perceived to be the "glaring problem" with this explanation:

> [O]nly the last page of the Notice of Lis Pendens contains a recording document for an unrelated address[,] but [t]he first twenty-eight pages . . . clearly identify Al-Sabah as the plaintiff against Agbodjogbe in the lis pendens, describe her fraud allegations, and establish that she was contesting title to the Pikesville [home].

*Id.* at *22. This, according to the district court, "refutes Pardes's testimony that the title company omitted the lis pendens from the final title policy because it found the lis pendens 'not to apply' to the Pikesville" home. *Id.*

Likewise, the district court "decline[d] to ascribe any meaningful weight to the form attorney opinion letter WBL obtained the same day it funded Loan Three." *Id.* The district court emphasized that there was "no evidence" whether the attorney who signed the letter knew about the lis pendens or Al-Sabah's fraud suit, and it was "unclear" which title commitments the attorney reviewed. *Id.* So, "given WBL's knowledge of [Al-Sabah's] pending fraud suit," it "makes no sense" for WBL to rely on the attorney to "sufficient[ly] vet[] any potential litigation against Agbodjogbe to the extent it would impact his loan obligations and accept[] the representations[.]" *Id.*

22

In the end, the district court concluded that, based on "the totality of all evidence elicited at trial and at depositions[,] . . . WBL was willfully blind to Agbodjogbe's underlying fraud during its processing of Loan Three." *Id.* at *23. We disagree.

2.

We now look at the information WBL had before it at the time it funded Loan Three, the actions it undertook, and how the district court went awry in reaching its conclusions.

On top of what WBL knew from underwriting the previous loans, it received a title report for the Pikesville home, which confirmed that Agbodjogbe was the owner of the home, but included a notation of an associated lis pendens. WBL sought to resolve the lis pendens so that it could proceed with closing. Fakioglu, WBL's vice president, asked Agbodjogbe about it and learned that he and his attorneys were working on a resolution. The lis pendens notation was relayed to at least three other WBL employees, including the title department manager, and ultimately to Pardes, WBL's COO at the time. But "shortly after" Pardes learned of the lis pendens, WBL received an updated title commitment that omitted it as it "was found not to apply to the subject property." J.A. 217. At that point, all "blemishes to title" were resolved and Pardes did not investigate the lis pendens any further.

WBL acted reasonably when it relied on the independent title insurance company's issuance of a title policy that omitted the lis pendens and did not include any other exclusions. That is *precisely* the purpose of title insurance—"[a]s an indemnity agreement, the insurer agrees to reimburse the insured for loss or damage sustained as a result of title problems, as long as coverage for the damages incurred is not excluded from the policy."

23

*Stewart Title Guar. Co. v. West*, 676 A.2d 953, 360 (Md. Ct. Spec. App. 1996) (emphasis omitted). In other words, if the title company got it wrong and the lis pendens applied to the Pikesville home, *it* would be on the hook to WBL for damages.[11] But WBL did more even though the title company's willingness to take on that risk was likely reason enough for it not to investigate further. WBL required another professional opinion, bolstering its decision to proceed with Loan Three: a long-form attorney opinion letter in which, based on his review of several relevant documents, Agbodjogbe's attorney represented that, "[t]o [his] knowledge, after due inquiry, there is no: (a) outstanding judgment . . . against or affecting" N&A Kitchen or Agbodjogbe or any of their properties; "(b) action by any government entity . . . pending or explicitly threatened against or affecting" N&A Kitchen or Agbodjogbe or any of their properties; or (c) "threatened or pending litigation against [N&A Kitchen or Agbodjogbe] that could adversely impact [their] ability . . . to perform the obligations under the terms of the" loan.[12] J.A. 796.

Like most lenders, WBL routinely obtains long-form attorney opinion letters to vet key issues, relying on counsel to adhere to the appropriate standard of care—"due inquiry." J.A. 219. A lender does so for good reason: it can safely rely on the attorney's

---

[11] The title policy provides that the insurance company "insures [WBL] in accordance with and subject to the terms . . . set forth in the American Land Title Association Loan Policy (6-17-06), all of which are incorporated herein." ECF No. 137-30, at 3. The "Covered Risks" of that policy "include title in someone else's name, defects in title, encumbrances on title, unmarketable title, and no right of access." W. Scott Tinney, Real Estate Practice in Maryland, in Practice Manual for the Maryland Lawyer (2023).

[12] The attorney also represented that (a) N&A Kitchen "has been duly organized and validly exists as an [LLC] in good standing" in Maryland; and (b) Agbodjogbe has "the power and authority to enter into and perform the obligations under the" loan. J.A. 795.

representations knowing that the attorney is on the hook if any representations fall through. *See Bennett v. Gentile*, 321 A.3d 34, 49–50 (Md. 2024) (holding a non-client can recover damages from an attorney for negligence if "the intent of the client to benefit the non-client was a direct purpose of the transaction" (quoting *Flaherty v. Weinberg*, 492 A.2d 618, 625 (Md. 1985)).

So, in broad strokes, WBL knew Al-Sabah sent Agbodjogbe "large sums of money[,]" he had "used at least some of that money to purchase the property he pledged as collateral for Loans One and Two," and the Notice existed. *Al-Sabah*, 2024 WL 263579, at *21. But WBL's affirmative due diligence—which resulted in not one, but two, independent professional opinions, which were further supported by the earlier professional opinion from the CPA, Leichter—led it to reasonably conclude that no further investigation into the lis pendens notation was necessary. Given the information it knew at the time, WBL's actions did not amount to willful blindness as a matter of law.

Al-Sabah, like the district court, disagrees. She argues WBL should have done more to run down the source of the lis pendens notation and, if it did, it might have discovered Agbodjogbe's fraudulent scheme. She and the district court are simply wrong, ignoring the totality of what WBL knew and did before proceeding with Loan Three.

We first observe that the district court attributed WBL with more knowledge of Agbodjogbe's fraud than it had by assuming that WBL had seen or reviewed the contents of the Notice and Al-Sabah's complaint. *See, e.g.*, *Al-Sabah II*, 2024 WL 263579, at *21 ("[A]t least eight days before WBL funded Loan Three on March 30, 2017, it knew that Agbodjogbe had just been sued for fraud by the very person who sent him the large wires

25

and that person, Al-Sabah, contested title to the very property Agbodjogbe pledged as collateral for Loan Three."); *id.* at *22 (rejecting Pardes' explanation that the lis pendens was removed before he reviewed it as it was found to apply to a different property because "only the last page of the Notice of Lis Pendens contains a recording document for an unrelated address"); *id.* at *23 (concluding that WBL's "knowledge of, and attention to, Al-Sabah's lis pendens and fraud suit created the conditions for WBL to pursue further investigation"). But as Al-Sabah conceded at oral argument, no evidence shows that anyone at WBL was ever aware of the actual contents of the Notice of Lis Pendens or the *Al-Sabah I* complaint. Oral Argument at 22:41–24:30. Rather, it shows only that WBL knew a lis pendens—associated with fraud litigation between Al-Sabah and Agbodjogbe—existed. The title report did not recount the details of Al-Sabah's claims; it simply noted that a notice of lis pendens was filed without any description of its basis.

The district court's erroneous assumption about WBL's "knowledge" only compounded its primary error: ignoring the input of the independent professional opinions. Start with the title insurance policy. True, WBL "asked the title company to take another look and omit [the title issues] that had belonged to the prior owner or omit [the title issues] that don't belong." *Al-Sabah II*, ECF No. 214, at 112. But such requests are routine in lending transactions. WBL asking the title company "to take another look," rather than the insurer doing so on its own, does not affect the result: the title to the Pikesville home was still insured and the insurer, not WBL, bore the risk of any title-related issue that might arise. *Al-Sabah II*, 2024 WL 263579, at *15 (citation omitted). WBL was fully entitled to rely on the title policy.

26

The district court also faulted WBL for relying on the "form" attorney opinion letter "given [its] knowledge of [Al-Sabah's] pending fraud suit" because there was no evidence Agbodjogbe's attorney knew of *Al-Sabah I*, and it was "unclear" what title documents the attorney reviewed. *Id.* at *22. Even if the letter was a "form" letter, that is beside the point. Regardless of who wrote the letter, a duly licensed and independent attorney—whom no one argues failed to adhere to the standard of care—signed it and is accountable for its representations. *See Bennett*, 321 A.3d at 49–50. Thus, WBL's reliance on the letter was reasonable and negates any claim of willful blindness.

Hindsight-focused erroneous conclusions led the district court to find willful blindness based on evidence that, at best, shows negligence. Perhaps WBL *could have* sought more. Maybe another lender would have done more, maybe not. But WBL's decision not to is not evidence of a deliberate effort to avoid uncovering Agbodjogbe's fraud. WBL's reliance on multiple independent professional opinions—a gold standard in lending practice—was not "the essence of willful blindness" as the district court found. *Al-Sabah II*, 2024 WL 263579, at *23. It was the mirror opposite. Like the district court found for Loans One and Two, WBL's actions concerning Loan Three are at best "couched in terms of negligence or recklessness and fall short of what the willful blindness standard requires." *Id.* at *21.

27

\* \* \* \*

For these reasons, we hold as a matter of law that WBL was not willfully blind to

Agbodjogbe's fraud in funding Loan Three.[13]

---

[13] Although not dispositive, one more point warrants discussion. As should be clear by now, Al-Sabah's theory of, and the district court's basis of imposing, liability against WBL in this case, centers on the Maryland lis pendens. Assuming Al-Sabah had a valid lis pendens on the Pikesville home (which was at issue with Loan Three), it terminated as a matter of law when the district court in *Al-Sabah I*—Al-Sabah's suit against Agbodjogbe—incorporated its denial of the imposition of the constructive trust over the home into the final judgment, which Al-Sabah did not appeal. *See* Md. R. 12-102(c)(2)(B) (providing that a lis pendens terminates as a matter of law "by entry of a judgment in favor of the defendant, if a timely appeal is not taken or the judgment is affirmed on appeal").

The lis pendens here arose from *Al-Sabah I*. Because a lis pendens cannot be based on an action for damages but applies only in "proceedings directly relating to the title to the property[,]" *DeShields*, 659 A.2d at 306, the only basis for the lis pendens was Al-Sabah's request for a constructive trust over the Pikesville home. Most of Al-Sabah's claims went before a jury, but the district court "determined that any request for declaratory and/or equitable relief [including the imposition of a constructive trust] would be decided by the Court in post-trial briefing." *Al-Sabah I*, ECF No. 279, at 4 (No. 1:17cv730). Al-Sabah assigned no error to that decision.

Following the jury trial, the district court entered judgment for Al-Sabah and against Agbodjogbe, consistent with the jury's verdict. *Id.*, ECF No. 259. Shortly after, Al-Sabah moved for the court to impose a constructive trust, arguing that the final judgment previously entered dealt only with "the claims adjudicated by the jury" but did not "end the action[.]" *Id.*, ECF No. 262, at 1 n.1. The district court denied that motion—i.e., it declined to impose a constructive trust—on March 4, 2020, *id.*, ECF No. 279, and entered an "amended order of judgment" on April 20, 2020, *id.*, ECF No. 288. In addition to entering judgment for Al-Sabah for monetary damages, the amended judgment incorporated "[a]ny and all prior rulings made by the Court disposing of any claims against any parties" and "deemed [them] to be a final judgment within the meaning of Fed. R. Civ. P. 58." *Id.*

In other words, the amended judgment in *Al-Sabah I* operated as an "entry of a judgment in favor of the defendant [Agbodjogbe]" on this claim. *See* Md. R. 12-102(c)(2)(B). Therefore, any lis pendens related to the Pikesville home terminated as a matter of law when the district court entered the amended judgment on April 20, 2020, nearly 4 years before the district court's decision here. *See id.* It was the district court, not WBL, that caused the lis pendens to expire, and with the expiration of the lis pendens, any equitable lien by Al-Sabah also expired.

Lastly, we simply observe that nothing in the record suggests that there was a corresponding filing of a lis pendens in New York relating to the NYC condo.

IV.

To recap, the district court correctly found that WBL was not willfully blind when it funded Loans One and Two but erred in finding that WBL was as to Loan Three. Put directly, WBL was not willfully blind as a matter of law regarding any of the loans at issue here. We therefore affirm the district court's judgment on Loans One and Two, but reverse it on Loan Three and remand this case with instructions to enter final judgment for WBL in all respects.[14]

*AFFIRMED IN PART,*
*REVERSED IN PART, AND*
*REMANDED WITH INSTRUCTIONS*

---

[14] Because we reverse the district court's judgment awarding compensatory damages for Al-Sabah and remand for entry of final judgment for WBL in all respects, we need not reach Al-Sabah's argument on cross-appeal that the district court's punitive damages award was an abuse of discretion. Al-Sabah Opening Br. 52–57. Lastly, we do not disturb the district court's award of judgment for WBL on Al-Sabah's unjust enrichment claim as it is not before us.